**Vincent ZUCH et al., Plaintiffs,**

v.

**John H. HUSSEY et al.,
Defendants.**

**Civ. A. No. 38757.**

United States District Court,
E. D. Michigan, S. D.

March 14, 1975.

As Amended April 28, 1975.

See also, D.C., 366 F.Supp. 553.

**1030**

George Hogg, Jr., William C. Potter, Jr., Alphonso R. Harper, Ernest Levin, Detroit, Mich., for certain defendants.

Theodore M. Rosenberg, Flint, Mich., John F. Burns, Detroit, Mich., for plaintiffs.

## MEMORANDUM OPINION AND ORDER

KEITH, District Judge.

This is an action brought by residents of several communities in Northwest Detroit to seek a remedy for certain alleged violations of the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. The matter is presently before the Court on the plaintiffs' Motion for a Preliminary Injunction.

The hearing on this motion lasted approximately ten (10) weeks, during which time the Court heard testimony from over fifty (50) witnesses. More than ninety (90) exhibits were admitted into evidence. After careful consideration of the matter and pursuant to the findings of facts and conclusions of law, the Court grants the plaintiffs' Motion for a Preliminary Injunction.

## INTRODUCTION

Perhaps the single most significant factor operating in this case is the racial fear of the white residents of the areas involved. At times, this fear has become so irrational and pervasive that it reflects a hysterical community psyche. Fears which reach this proportion perhaps reflect accurately on racial relations in our city, but such fears alone cannot be the basis for finding a violation of the Fair Housing Act.

Throughout the ten (10) weeks of testimony, the defendants made several allegations about the plaintiffs' motives in bringing this action. One charge was that the plaintiffs were seeking to prevent further entry of blacks into their neighborhood. Another was that they were seeking to put certain real estate agencies out of business because they were dealing with blacks. The defendants sought earnestly to elicit testimony from the plaintiffs' witnesses and from their own witnesses to support these allegations. While the Court is of the opinion that violations of the Fair Housing Act were shown by the plaintiffs, it also believes that there was some evidence which supported the allegations of the defendants.

Witnesses testified that if their communities became significantly black, they would move. There was testimony about the initial reaction of residents to the entry of the first black family into the Emerson Community. Frantic meetings were described in which racial hatred was vented and schemes were suggested to physically remove the black family from the community. There was also evidence that the officers of the Emerson Community Homeowners Association (ECHO)[1] used their organization's newspaper to recommend certain favorite real estate agencies to their readers. There was also an admission by Vincent Zuch, one of the most active plaintiffs, that he was "at war with the real estate industry." This Court does not condone any of this. It is mentioned only to show the complexity of the issues involved.

The Court also observed that many of the witnesses had had little or no day to day interpersonal contact with their black neighbors. As a result, some of

---

1. ECHO is a community group which was formed in 1971 to deal with the problems of racial transition in Northwest Detroit. Most recently, it has concentrated on exposing the activities of the real estate industry associated with this transition.

them exaggerated the significance of certain activities which they observed.[2] In part, these witnesses are victims of their own isolation, prejudice and ignorance. Their fears are products of the kind of racial isolation the Fair Housing Act was designed to end. The Court has taken all of this into consideration in reaching its decision.

## I. FINDINGS OF FACTS

After considering the evidence offered by both sides at the hearing on the plaintiffs' Motion for a Preliminary Injunction, the Court makes the following findings of fact and conclusions of law.[3]

### A. THE AREA

This action involves an area of Northwest Detroit which lies west of predominately black neighborhoods and east and south of predominately white neighborhoods. It is bounded on the east by Southfield, on the north by Seven Mile Road, and on the west by Heyden Street between Seven Mile Road and Six Mile Road and thereafter by Evergreen Road. The southern boundary, generally, is a line running through Acacia Street.

Approximately six thousand five hundred (6,500) families live in the area.

Within this area, there are several sub-communities. Perhaps the most important, to this action, is the Emerson Community whose residents are principally responsible for this law suit. Also included in this area are North Rosedale Park and Rosedale Park (also called South Rosedale Park and South Rosedale).

The plaintiffs produced ample evidence at the hearing to support their contention that the area in question was a racially transitional neighborhood, commonly referred to as a "changing neighborhood." To the layman, either expression is used and understood to mean that blacks are moving into an area. United States v. Mintzes, D.C., 304 F.Supp. 1305, 1311 (1969). The social scientist, when discussing a racially changing neighborhood, also starts from the premise that a neighborhood is in transition when white families are being replaced by black families in existing dwellings. Dr. Frances Cousens, who qualified as an expert for the plaintiffs,[4] testified that a racially changing

---

2. One witness testified during the hearing that he was motivated to participate in this action when he heard rumors of real estate salesmen bringing black families out to view houses at night. On these visits, according to the rumors, the salespeople would put lights on in order that the neighbors could see that the prospective buyers were black. The Court has no doubt that under certain circumstances this may have been done with that purpose in mind. But the witness also testified that under the same conditions, he would not have been concerned if the buyers had been white. There are perhaps ways to show a house to a black family at night without the aid of lights, but the Court is unable to think of any that would be either practical or effective. The question arises, then, how is a black family to be shown a house after dark without arousing fears in the minds of the white families living in that community?

Additionally, however, the Court heard testimony of visits by black real estate salespeople to the homes of white residents of the Emerson Community to solicit listings. Such visits may be quite innocent; but in

light of other factors external to the visit, they may also reasonably be viewed as designed to exploit the racial fears of the community. The Court, therefore, has had to chart its course between irrational fears on the one hand and exploitation of these fears on the other.

The Court recognizes the possibility that some of the plaintiffs herein may have been motivated to bring this action because they desired to keep black families out of their neighborhood. Nevertheless, the overwhelming weight of the evidence produced at the hearing supports the granting of the relief sought in their motion.

3. Unless otherwise indicated and for the purpose of deciding this motion, the Court credits the testimony of the witnesses as it is described, *infra*.

4. Dr. Frances Cousens qualified as an expert by virtue of her education and her research and professional activities in the fields of sociology and social psychology. Dr. Cousens has a Ph.D. in sociology, was the first research director of the Michigan Civil Rights Commission, was involved in research and evaluation

neighborhood is a residential area which is beginning to experience the entry of non-white families. In the Court's opinion, the area of Northwest Detroit, defined by the plaintiffs in their complaint, is a racially transitional neighborhood.

Prior to 1971, there were no minority families living in the Emerson Community and no more than three lived in the Rosedale Communities. The first black family moved into Emerson in 1971, purchasing a house on Edinborough Road. The present racial composition of the area is estimated to be between ten (10) and twenty (20) per cent black. The other two (2) communities have also experienced an influx of blacks, although somewhat less dramatically than what has occurred in the Emerson Community. While the total number has decreased, there has continued to be some movement of white families into the neighborhoods. There is no questioning, however, the contention that Northwest Detroit has undergone a striking shift in its racial composition in the last four (4) years.

In this context, the continued pace of such racial change in this area is critical. Areas in transition seem to experience rapid population turnover which in large part results from "panic selling," Barrick v. City of Gary, D.C., 354 F. Supp. 126 (1973). The problem of panic selling arises where white residents succumb to perceived pressures to move out because blacks are beginning to enter the neighborhood. According to the Court in *Barrick*, supra, at 135, the pressure to move stems from evils associated with the entry of black families: crime, overcrowding, depressed property values, and the fear of being "left behind."

The testimony taken at the hearing indicates that there are white residents of Northwest Detroit who do in fact correlate the entry of black families with the incidence of lower class social pathology. From their testimony, there emerges the following psychological equation: The quality of life in a community diminishes with the entry of minority familes, particularly black families. It is these fears, and this psychology, that the defendants in this action are alleged to have exploited or attempted to exploit.

Dr. Cousens described the problem well when she testified at the hearing:

"I believe that in the minds of most people, they perceive the function of the real estate broker as being instrumental in producing change in the neighborhood, a change which increases their own apprehensions and their own instability . . .

The first black family entering an all-white neighborhood tends to pay more for the housing than would be paid by white families purchasing the identical house. Then because of the fears generated, the perception of white residents in the area causes a great many white people to put up a great many houses for sale within a very short period of time. This flooding of the market tends to have a negative effect on the price stabilization of the housing in that area.

When the area becomes predominantly black, then you again achieve price stabilization in the area.

You may also achieve social and psychological stability when a neighborhood becomes black because what you have done is re-segregated the neighborhood and the process of change, of transition, is already in the past."

Compare, United States v. Mitchell, D. C., 335 F.Supp. 1004, 1005 (1971).

The accelerated pace of racial change resulting from panic selling is evidenced by the history of racial segregation in

in The Great Cities Project administered by the Detroit Public School System, and has served as a consultant to the Department of Housing and Urban Development and has

done extensive work in the area of fair employment practices. She is now a professor of sociology at the University of Michigan, Dearborn Campus.

other areas of Detroit. Patricia Becker, an expert for plaintiffs,[5] described the manner in which the black population has spread toward the Detroit city limits.[6] She testified that the black population has been contained until recently; that black neighborhoods have spread block-by-block; that there has been virtually no permanent integration in Detroit; and that the current rate of movement of the black population is about one (1) mile every three (3) years.[7]

The issue which arises at this point, therefore, is not whether the process by which white families are replaced by black families is either irrational or inevitable, as well it might be. The real issue in this litigation is whether the real estate industry should be allowed to enter into the process and, for commercial advantage, artificially hasten or at least accelerate the rate of population turnover and the pace of racial change. As the Fifth Circuit so accurately noted in United States v. Bob Lawrence Realty, Inc., 5 Cir., 474 F.2d 115, 124 (1973):

"The sociological phenomenon of a transitional area is enough to attract blockbusters [8] intent upon culling all the profits that can be derived from the area. The very essence of the phenomenon is that a large number of competitors individually besiege an area seeking to gain a share of the market." [Footnote supplied. The Court of Appeals footnote omitted.]

The concept of a racially transitional neighborhood is critically important to this litigation, because it is within this context that the activities of the real estate industry, in general, and the defendants, in particular, must be scrutinized. From the evidence before the

5. Patricia Becker qualified as an expert on behalf of the plaintiffs by virtue of her educational background and professional activities in the area of population studies, data and statistics. She has a Master's degree in sociology, has worked with a number of population study programs, and is currently in charge of the data and statistical programs for the City of Detroit Community Development Commission.

6. A comparison of the 1960 and 1970 population figures for the City of Detroit shows that during the decade in between, the overall population of the city decreased from 1,670,144 in 1960 to 1,511,482 in 1970. The number of white residents decreased from 1,182,223 in 1960 to 838,877 in 1970. At the same time, the number of black residents increased from 482,223 in 1960 to 660,428.

During the same decade, however, the total population for the Standard Metropolitan Statistical Area (SMSA), which includes those cities and towns in Macomb, Oakland, and Wayne Counties which are socially and economically integrated with Detroit, increased from 3,762,360 in 1960 to 4,199,931 in 1970. The number of whites increased from 3,195,372 to 3,419,720, and the number of blacks increased from 558,870 to 757,083. A simple analysis of these figures shows that during the period from 1960 to 1970, the population shift of whites has been away from Detroit and into the surrounding suburbs. There is nothing to suggest that this trend has not continued since 1970 nor does

anything suggest that it will not continue unless something affirmative is done to halt it. Population figures taken from U. S. Bureau of the Census, Census of Population and Housing: 1960, CENSUS TRACTS, Final Report PHC (1)-40, Detroit, Michigan, SMSA; and U. S. Bureau of the Census, Census of Population and Housing: 1970, CENSUS TRACTS, Final Report PHC (1)-58, Detroit, Michigan, SMSA.

7. Observations by social scientists of residential patterns in a few large northern cities such as Detroit also seem to indicate that the replacement of white by black population in city neighborhoods occurs as a process of "racial residential succession." Essential to this concept of residential succession is the assumption that a period of brief integration will inevitably be followed by prompt resegregation. The process is considered irreversible. Any area which gains more than a few black residents tends to become more and more black, until it "tips." See Otero v. New York City Housing Authority, 2 Cir., 484 F.2d 1122, 1135 (1973). For an excellent discussion of this phenomenon from a social science perspective, see Taeuber and Taeuber, Negroes in Cities: Residential Segregation and Neighborhood Change, Aldine Publishing Co., Chicago, 1965.

8. Compare the definition of blockbusting in 34 A.L.R.3d 1432, 1433: "A technique whereby real estate brokers perpetuate segregated neighborhoods."

Court, it appears that if the real estate industry is allowed to operate unchecked, the pace of racial transition will be manipulated in a way that will irreparably distort any chance for normal and stable racial change.

## B. THE PLAINTIFFS

The plaintiffs are a multi-racial group of homeowners, overwhelmingly white, who live in one (1) of the three (3) sub-communities which constitute the area in question. The white plaintiffs have lived in their respective communities for varying lengths of time; the black plaintiffs are persons who have recently moved into the area.

## C. THE DEFENDANTS

The defendants are a group of incorporated and unincorporated real estate agencies and a number of individual real estate salespersons. All of the defendants operate in the Detroit Metropolitan area, and all operate or have operated in the area in question.

The defendants' earnings are derived from commissions paid on houses which they sell. They, through their salespeople, act as agents for sellers who list with them their houses for sale; in addition, they assist buyers in the negotiations of sale contracts with sellers. Commissions are earned only when a sale has been consummated. Most of the defendants' sales involved single-family dwellings in the Detroit Metropolitan area. At all times relevant herein, the individual defendants were acting within the scope of their duties as salespersons for the various defendant real estate agencies.

## STEERING AND BLOCK-BUSTING

### 1. EARL KEIM REALTY COMPANY

The defendant Earl Keim Realty (Keim) is a sole proprietorship owned by Brian P. Hussey. Its principal office is at 22727 Michigan Avenue in Detroit, with branch offices at various locations in Detroit, Redford and Southfield, Michigan. The defendants Virginia Greenwood, Helen LaPage, Ethel Wallace and Roy M. Wilson, III, are or were at one (1) time employed by Keim Realty as salespersons.

Mrs. Marilyn A. Waddell, a resident of the Emerson Community for over five (5) years, testified that she was approached by a woman in May of 1972 while she was working in her yard. The woman, who was not identified by Mrs. Waddell, but whom the attorneys for the plaintiffs identified in their Proposed Findings of Fact as Helen LaPage, introduced herself to Mrs. Waddell as a salesperson working for the defendant Keim. The witness testified that the woman asked her if she knew "what" was moving in next door to her; Mrs. Waddell replied that she knew "who" was moving in and that she had met her next door neighbors and felt that she was going to like them. The family next door was black. The woman indicated that Keim had sold a house recently on her block and directed Mrs. Waddell's attention to a Keim sign in a yard about three (3) houses from her own. She told Mrs. Waddell that she could not live with "them" and left. Mrs. Waddell was subpoenaed by the plaintiffs to testify.

In spite of the fact that the plaintiffs, in their Proposed Findings of Fact, identified the woman with whom Mrs. Waddell conversed as Helen LaPage, a salesperson employed during the relevant period by Keim, no evidence was introduced by the plaintiffs which established such identity. The witness's testimony, therefore, may not be used to find Keim liable for the conduct of the woman with whom Mrs. Waddell spoke.

The second witness to testify against the Keim Realty Company was Ernest Bago, also a resident of the Emerson Community. Mr. Bago visited the Keim office on Seven Mile Road and Inkster Road in June, 1972, and again on July 3, 1972. He testified that he went to the realty office because he had heard rumors of objectionable activities by real estate salespersons in his community. Among these rumors was one (1) that

salespersons were showing houses to black customers at night with lights on and the windows unobstructed

### June, 1972, visit.

Mr. Bago, posing as an out-of-towner, spoke initially to defendant Ethel Wallace. He indicated that he was interested in buying a house in the Emerson area. The defendant said she would be happy to show him such a house, indicating, however, that Emerson was not in her office's area.

Mr. Bago asked Ms. Wallace if the Echo area was integrated and was told that this could be answered better by the Keim office on Grand River and Outer Drive. "They know where the concentrations of blacks are," she was reported to have said.

Nothing further was discussed at this meeting.

### July 3, 1972, visit.

Mr. Bago telephoned the Keim office before his second visit and talked to a person whom he identified as the defendant Virginia Greenwood. Before the witness arrived at the office, Ms. Greenwood had called Ms. Wallace, who was not present, to identify the witness as the person with whom she had talked earlier. Ms. Greenwood told the witness that she had checked with Ms. Wallace and that she would assist him.

On the desk in the office was an open map. Mr. Bago went to this map and pointed out the area in which he was interested. The defendant asked if Mr. Bago had lived in Detroit before; he replied that he had not.

The defendant then told him that she had some nice areas in which he may be interested outside of Detroit. "The school system is poor in Detroit," she was supposed to have said. She continued, "Do you read the newspapers? Even the police are afraid to live in the area, and they are supposed to protect the rest of us."

On the map, Ms. Greenwood drew a line with a marker along Warren Avenue. In the towns of Inkster, Westland and one (1) other area (Wayne), she drew "X's" and also in an area of Livonia where there was a nearby race track. These were areas which the witness was told to avoid as well as the area south of Warren Avenue (See P. Ex. 19).

The witness asked why these areas should be avoided and was told that blacks lived in Inkster and were moving into Garden City, Westland and Wayne. She suggested Livonia and Farmington as areas where there was a low crime rate and desirable conditions under which to raise a family.

The defendant gave the witness two (2) listings books, one (1) for Detroit and one (1) for Farmington (P. Exs. 20, 21), and he was told to take them home to compare the prices of homes in the suburbs with those in Detroit. Ms. Greenwood indicated that prices were lower in Detroit because blacks lived there. She said that the Rosedale Park area was kept white by not putting up "For Sale" signs.

The defendant related to the witness that her agency was a member of the United Northwestern Realty Association (UNRA), and they had to show homes in all white areas to blacks. Nevertheless, they were able to avoid having to sell to blacks by asking the owners to take the houses off the market temporarily.

Mr. Bago, after leaving the Keim office, immediately took the multi-list books to the plaintiffs' attorney to be used as evidence in this action. Theoretically, with access to these books, the witness had all houses listed therein available to him for purchase. Also, unknown to the witness at the time, the multi-listing services were apparently available to black brokers and salespersons who were members of UNRA.

On cross-examination, the witness admitted that the defendants would probably not have refused to sell him any house that he might have insisted on buying, wherever it was located.

Mr. Richard Cartwright, a resident of the South Rosedale area of Detroit, and a member and former President of the Rosedale Park Improvement Association, testified that in the early part of 1972 (late January or early February) he visited the Keim office located in the 19000 block of Grand River (between Warwick and Outer Drive). He went with Mr. Ross Lindsay who was the vice-president of the Association at that time. Mr. Cartwright testified that he gave his name as Jack Carter from Flint. He testified that when asked if he needed help, he told Mr. Wilson, a salesperson for Keim, that because of a job transfer he was looking for a home in the Rosedale Park area. He told Mr. Wilson that he and Mr. Lindsay had been driving around the South Rosedale area across from Mr. Lindsay's residence. In the course of this tour, he had noticed a home with a for sale sign on it on Piedmont Road; the sign indicated that the listing was with Keim.

Mr. Wilson, according to Mr. Cartwright's testimony, said that it was a fine home but that "we have many homes in many other areas too." When asked specifically about Rosedale Park, Mr. Wilson replied, "It's fine if you like a busted community." Mr. Cartwright pressed Mr. Wilson to explain what he meant by a "busted community" and he finally responded that a busted community was one that blacks had moved into. Mr. Cartwright asked the salesman to explain the effect that the presence of blacks had on a community. He replied that housing values are down, and will continue to go down, and that while the schools in Rosedale are okay, "You know what will happen eventually." Mr. Wilson suggested, in response to a question, that the witness consider Farmington. Mr. Cartwright then left the office, under the pretense that he would wait to discuss the matter further with his wife.

On cross-examination, Mr. Cartwright indicated that the defendant Mr. Wilson had not made any housing unavailable to him. Mr. Cartwright also indicated that he felt that blacks have a greater propensity than whites to commit crimes.

Mr. Cartwright also indicated that he was very active in gathering evidence for this action. He counseled people in his Association's newspaper, "The Rosedale Park News," to make visits to various brokers and advised them of the procedures to follow to gather evidence. At one point, he admitted that in an October, 1972, column he had advised people not to bring up the subject of race, "unless it would be helpful." The witness explained that by "helpful" he meant that the tester should allow the brokers to bring up the subject of race, but that if they did not, the person should see what the broker would say about blacks in the area. Mr. Cartwright's newspaper also ran a column in its October, 1972, edition which appealed for more evidence in this action.

## 2. C. SCHUETT REALTY, INC.

Defendant C. Schuett Realty, Inc., (Schuett) is a Michigan corporation engaged, inter alia, in the listing and sale of real estate. Its office is located at 19228 West McNichols in Detroit. Defendants Ben B. Miller and Jerry O'Rourke are employed as salespersons by Schuett Realty.

Mrs. Dorothy Taylor, a plaintiff in this action and a resident of Northwest Detroit for over twelve (12) years, testified that she visited the office of the defendant Schuett on June 24, 1972, to inquire about a four (4) or five (5) bedroom house for relatives who were planning to move to Detroit from Illinois. She spoke to the defendant Jerry O'Rourke.

Mr. O'Rourke told the witness that a home similar to the one in which her relatives were interested had just been sold to a nice "white family." He indicated that he did not have any others in the Northwest Detroit area. He then asked the witness if she was interested in selling her home; the witness said that she was not. Mr. O'Rourke then

handed her his card and told her that maybe she would change her mind.

Mr. O'Rourke talked with Mrs. Taylor mainly about the Brighton and Redford areas. He told her that the schools in Brighton were so much better and that Brighton had so much more to offer than Detroit. The entire visit lasted about thirty (30) minutes.

In the verified complaint, Mrs. Taylor alleged in paragraph 7.10 that:

"On June 22, 1972, defendant Jerry O'Rourke, acting within the scope of his employment by and at the offices of defendant, Schuett, attempted, for profit, to obtain the listing of plaintiff Dorthy Taylor's dwelling at 17200 Ashton, Detroit, by *making representations regarding the entry or prospective entry of black families into her neighborhood.*"

Mrs. Taylor was asked by Mr. Harper, an attorney for several of the defendants, whether Mr. O'Rourke made any representation to her regarding the entry or prospective entry of black families into her neighborhood. She replied that he had not, but that was probably what he wanted to say.

On re-direct, Mrs. Taylor was asked what she understood the defendant to mean when he handed her his card and told her that she may change her mind about selling her house in a year or so. She responded that she understood this to mean that the area was going to change so fast that she would change her mind about moving.

This witness failed to convince the Court that Mr. O'Rourke engaged in any conduct which, under the circumstances, could reasonably be interpreted as having violated any rights protected by the Fair Housing Act. However, while the Court cannot credit the testimony of Dorothy Taylor, it does note that the defendant Jerry O'Rourke has never sold a home to a black family either in Detroit or in the suburbs, and that of the four (4) homes he sold in the suburbs, all were sold to white families.

The plaintiff Frank O'Keefe, a resident of the Northwest Detroit area for several years, testified about a visit he made to the Schuett office on the corner of West Outer Drive and Six Mile Road in Detroit in the early summer of 1972. Mr. O'Keefe testified that at the office of the defendant he spoke to a salesperson identified as Mr. Ben Miller. Mr. O'Keefe testified that his purpose in making the visit was to determine how his community was "being handled" by the real estate industry. He had witnessed a very noticeable increase in real estate solicitation after a black family had moved into his neighborhood in the summer of 1971. He is a member of the Emerson Community Homeowners Association. After the black family moved in, Mr. O'Keefe testified, ten (10) to twelve (12) homes were sold on his block alone. "Many people abandoned the neighborhood," he added. Mr. O'Keefe is a member of the Emerson Community Homeowners Association (ECHO).

At the Schuett office, the witness approached the first salesperson he encountered and indicated that he was interested in a home in the ECHO area in the Twenty-Five Thousand Dollar ($25,000.00) range. The plaintiffs introduced into evidence the business card of Ben Miller, a salesperson for Schuett (P. Ex. 14). The witness pretended to be interested in a three (3) bedroom colonial type house.

The witness testified that Mr. Miller took out a book of listings for the Farmington and Livonia areas. Mr. O'Keefe, however, directed the defendant's attention to a listing in a Detroit area book on Mansfield Street. The defendant's reaction, according to O'Keefe was, "You wouldn't want that home, the coloreds have moved in pretty good there."

The witness replied, "That doesn't bother me."

Mr. Miller then replied, concerning the area where the Schuett office was located, "This neighborhood is pretty

good, the coloreds have moved in, but there are still some pretty good buys."

The entire visit lasted no more than five (5) minutes. Mr. Miller testified that he offered to drive the plaintiff around and show him houses in the Detroit area; the plaintiff admitted this. Mr. Miller also testified that almost all of his real estate sales were in the Detroit area and that he himself lived in an integrated area within the City of Detroit.

### 3. JOHN H. HUSSEY COMPANY

The defendant John H. Hussey Company (Hussey) was a Michigan corporation engaged in the business of listing and selling real estate. Defendants Jim Brady and Jim McNish were employed as salespersons by Hussey.

Michael R. Secord, a plaintiff in this action, moved into Northwest Detroit in June, 1972. At this time, he was working for Mr. Ernest Bago, another plaintiff. When he indicated that he was interested in moving from Clinton Township, Mr. Bago suggested to him that he inquire about buying a home in Northwest Detroit. In February, 1972, he visited the Hussey office on Six Mile Road and spoke initially to James Brady.

The witness testified that Mr. Brady told him not to look at houses east of Southfield because that was a changing area. Mr. Secord ultimately purchased a house in Northwest Detroit from Mr. James Delany of the Hussey Company.

Mr. Secord admitted that he was satisfied with the service rendered to him by Hussey's salesperson and agreed that neither salesperson refused to show him any house which he wanted to see. Mr. Secord also testified that he would not want to live in an area that was more than fifty (50) percent black, because as he put it, he did not "want to be in a neighborhood where he was excluded."

The witness, on cross-examination, was taken through a series of questions which concluded with the following:

> Attorney Levin: If the broker who was making the sale (to you) knew that the neighborhood (in which the house was located) was eighty (80) percent black, would you be mad if he didn't tell you?
>
> Mr. Secord: Yes.
>
> Attorney Levin: Then if he knew, you would expect him to tell you that the neighborhood was eighty (80) percent black?
>
> Mr. Secord: Yes.

Mr. Levin, prior to this, had asked the witness if he would expect the salesperson to tell him that he would be living next door to welfare recipients. He went on to ask if the witness would expect to be "educated" about the neighborhood, to be told that it was either all black or all white, or whether there were adequate schools, churches and transportation. The witness answered that he would want to be told such things.[9]

9. The testimony of Mr. Secord was convincing. The questioning by Mr. Levin is not lost on the Court, however. It is apparent that the witness, and perhaps the defendants, believe that the racial composition of a community is relevant in determining whether to buy a home there. It is further apparent they, perhaps, feel that it is proper for a real estate salesperson to inform a prospective buyer of the racial composition of a community, if he or she knows it. This Court, however, finds such information irrelevant in the context of this suit. The defendants have not related such "information" to the testers for the purpose of informing him of the nature of the area. Rather, such information has been used to channel the po-

tential white home buyer away from areas in which a significant number of blacks live.

It is also irrelevant what the plaintiff may feel about living next door to a welfare recipient or about living in a neighborhood which is more than fifty (50) percent black. The number of blacks in a neighborhood is not analogous to the character of the schools, or the adequacy of the transportation system or the number of churches. Much of the tensions and fears to which the witnesses in this action testified have resulted from an inability on their parts to accept black people as human beings rather than objects of the environment to be avoided. Where the concern of the buyer is the number of blacks in the neighborhood and not

Vincent Zuch, perhaps the most active plaintiff in this action and a resident of Northwest Detroit, made visits to four (4) real estate offices on June 23, 1972, among them the Hussey office on West McNichols and Evergreen. At the office of the defendant, he spoke to James McNish.

Mr. Zuch indicated to Mr. McNish that he was from Wisconsin where he had worked with a man who had lived in Detroit eleven (11) years ago. He said that he was now relocating to Detroit and that he was interested in purchasing a house. He had with him a hand drawn map, which he stated was prepared by a friend in Wisconsisn. The map was supposed to indicate an area of Northwest Detroit near Six Mile Road and Huntington Road in which his friend suggested he might be interested.

Mr. Zuch testified that Mr. McNish told him that Detroit was "Zilch, it's out." He suggested that if the witness wanted a good place to live, he should go to Redford where he lived. The defendant added that Detroit was having problems, that property values were down and that blacks lived there. Mr. Zuch then ended the conversation by telling Mr. McNish that he had to leave and that he would return later that weekend with his wife.

On cross-examination, the defendants sought to elicit more details of the visit from Mr. Zuch. They asked him to recount the exact manner in which he described the area of Northwest Detroit to the defendant. Mr. Zuch said he had told Mr. McNish that he understood the area to be a "good" neighborhood. The witness was very general when asked to define what he meant by "good." He recalled saying to Mr. McNish that he was concerned about leaving his wife and children at home while he worked. He indicated that this was said in the context of referring to the Six Mile and Huntington area as a "good" neighborhood.[10]

### 4. JOE E. NORWOOD NO. 1 INC.

Joe E. Norwood No 1. Inc. (Norwood) is a Michigan corporation engaged in the business of listing and selling real estate. Its office is located at 17421 Telegraph, Detroit, Michigan. Defendant Mark Zehnder is employed as a saleperson by Norwood.

Mrs. Susan Williamson, subpoenaed by the plaintiffs to testify, was visited by a man at her former home on Edinborough Road prior to February, 1972. She identified this man as being employed by "Norwood Realty." She said that the man was the same man who had sold the house next door to a black fami-

---

the quality of life there, racism is permitted to influence his decision. This racism makes him prey to unscrupulous real estate salespersons who exploit it for their own pecuniary gain. In the process, the black person becomes the real victim.

The battle line in the fight against such exploitation must be in the minds of the residents of the area. If they expect real estate salespersons to warn them of the presence of blacks, they cannot long expect to escape one day being the victims. The Court in this instance can enjoin the defendant from attempting to channel prospective buyers into areas which he feels would be better suited to the race of the buyers, but the Court cannot stamp out the expectations of the buyers. The result is that a thin line is drawn between illegal conduct and satisfying the customer, until eventually the two (2) are merged.

10. The testimony of Mr. Zuch touches on a problem which the Court must address. First, the witness approached the defendant and described an area of Detroit which was supposed to have been a "nice" neighborhood eleven (11) years earlier. Second, the witness also indicated that he was concerned about the safety of his family. The defendant claims that Mr. Zuch was using a codeword which solicited a discussion of race.

The Court is of the opinion that even if the defendant understood the plaintiff's use of "good" neighborhood and his reference to safety as codes for fear of blacks that does not legally excuse his response. The real estate agent must be prevented from allowing race to enter at all as a factor in any of his sales. To do otherwise would invite sophisticated sales pitches designed to circumvent the purpose of the Fair Housing Act; Congress could not have intended this result.

ly in early 1972. She testified that the man came into her home and told her that he had just sold the house next door to a black family. He told her that she could get a good price for her home if she sold now. Mrs. Williamson eventually sold her house and moved to Brighton, Michigan.

While Mrs. Williamson's testimony was convincing, her identification of the man with whom she conversed was insufficient to hold Norwood liable for his conduct.

On June 23, 1972, Mr. Vincent Zuch visited the office of Norwood on Telegraph and Grand River and posed as a businessman from Wisconsin in the same manner that was described during his visit to the defendant Hussey's office, *supra*. He discussed the purchase of a house in the Twenty-Five Thousand Dollar ($25,000.00) range with Mr. Mark Zehnder, a salesperson for Norwood.

Mr. Zuch testified that Mr. Zehnder told him that he had come to the right man. The defendant allegedly told Mr. Zuch that the exodus was on, that whites were moving out of Northwest Detroit, blacks were moving in, and, as a result, property values were going down. Mr. Zehnder told the witness that he should consider Farmington where the schools were better and the shopping just as good.

Mr. Zehnder testified that he suggested Mr. Zuch purchase a home in Farmington because that was where he lived. In his opinion, it was a nice place to live. He also testified that he thought the schools in Farmington were better than those in Detroit but that the shopping in Detroit was better than that in Farmington. He denied making any statement about the racial composition of either Detroit or the suburbs. Mr. Zehnder said that he recommended Farmington in the first place, because Mr. Zuch had requested that he suggest a nice place to purchase a home.

## 5. MAYFAIR REALTY COMPANY

The defendant Mayfair Realty Company is a Michigan corporation engaged in the business of listing and selling real estate. Its office is located at 16325 Middlebelt, Livonia, Michigan. Defendants Jerry Borregard and William Willis are employed as salespeople with Mayfair Realty.

Mr. Daniel Maxwell, a resident of Northwest Detroit and a plaintiff in this action, testified that he made several visits to the office of Mayfair Realty located on Schoolcraft Road in Detroit. He testified that the first such visit occurred on July 2, 1972, at approximately 4:00 P.M. His interest in visiting the defendant's office was to find out about the "steering of people" by the defendant.

Mr. Maxwell recalled that he left his name and telephone number with a receptionist on the first visit after being told that no salesperson was available to assist him. He called the defendant's office a week later after receiving no response to his visit. He was again told that no salesperson was available and that someone would call him later. He was never called.

On July 23, 1972, Mr. Maxwell returned to the Mayfair office on Schoolcraft and spoke to Jerry Borregard. Mr. Borregard gave the plaintiff his card and told him to come back as he was "too busy" at that time to assist him. Mr. Maxwell never returned. Mr. Maxwell was unable to say exactly why the defendant did not assist him, but ventured the opinion that it was because he was black and was interested in purchasing a home in the suburbs.

Mr. Borregard testified that at the time of Mr. Maxwell's visit to his office, he was in fact too busy to assist the witness. He testified he was consummating a deal with a customer and was the only salesperson in the office. He testified that he offered to show the plaintiff the house in which he was interested if

he returned the next day but that he never returned.

Under the circumstances described by Mr. Maxwell, the Court does not believe that it is reasonable to conclude that the defendant's actions toward the plaintiff were due to Mr. Maxwell's race.

Mr. Zuch visited the office of Mayfair Realty on West McNichols, west of Telegraph Road, on July 23, 1972, and spoke to Bill Willis. Mr. Zuch posed as a businessperson from Wisconsin and related the same story to the defendant that he had used in other visits described, *supra* at 1039. Mr. Willis was accompanied by a small boy, approximately fourteen (14) years old. He told the plaintiff that he was in a hurry and did not have much time to assist him.

Mr. Willis, according to the plaintiff, tore a map from a book and drew a line through Metropolitan Detroit. The plaintiff was told to think of the line as an imaginary boundary. East of the line, Mr. Willis is supposed to have explained, property values were down and there were other problems caused by the presence of black people (P. Ex. 34). Mr. Willis also gave to Mr. Zuch a listing of houses in Redford and Livonia and told him that he should look there for a house to purchase.

The meeting between Mr. Willis and Mr. Zuch was very brief. Mr. Willis denied making any statements concerning race in his conversation with the plaintiff. The Court credits the testimony of Mr. Zuch and finds that Mr. Willis, acting within the scope of his employment, attempted to channel the plaintiff into the suburbs of Detroit by suggesting that he use race as a factor in determining where to purchase a house.

## 6. LEXINGTON HOUSE REAL ESTATE COMPANY

Lexington House Real Estate Company is a Michigan corporation engaged in the business of listing and selling real estate. Its office is located at 28422 Joy Road, Livonia, Michigan. The defend-

ant Bernard O'Laughlin was employed by Lexington House as a salesperson.

Mr. James Irvin, a resident of Northwest Detroit and a plaintiff in this action, visited the Lexington House office on Joy Road in Livonia on July 31, 1972, and spoke with Mr. Bernard O'Laughlin. Mr. Irvin is black.

Mr. Irvin testified that his purpose in visiting the Lexington House office was to determine if the salespeople there would assist him in purchasing a house in Livonia, a suburb of Detroit. According to the plaintiff, Mr. O'Laughlin told him that the houses which he could afford in Livonia were substandard and suggested that he consider Inkster or Westland. Mr. O'Laughlin told Mr. Irvin that he would not be comfortable living in an area where he would have no black neighbors; Inkster, the defendant told Mr. Irvin, was forty-three (43) percent black. Mr. Irvin's testimony was uncontradicted. Mr. O'Laughlin, at the time of the preliminary injunction hearing, was no longer employed by Lexington House and was living in the State of Arizona.

## 7. JOY REAL ESTATE COMPANY

The defendant Joy Real Estate Company is a Michigan corporation engaged in the business of listing and selling real estate. Its office is located at 27320 Grand River, Detroit, Michigan. The defendant Arnold Windmueller is a former salesperson for the defendant Joy Real Estate Company.

Mr. Vincent Zuch visited the office of the defendant Joy Real Estate Company and spoke to the defendant Windmueller on June 23, 1972. During this same period, he had visited three (3) other real estate offices in the Detroit area. Mr. Zuch testified that he posed as a businessperson from Wisconsin and that he related the same story to Mr. Windmueller that the Court has noted, *supra*.

According to Mr. Zuch, Mr. Windmueller recommended purchasing a house in the suburbs of Farmington

where, in the defendant's opinion, property values were better than those in Detroit and where transportation was about the same. The defendant made this recommendation in spite of his belief that the plaintiff could get twice the house for his money in Detroit. Mr. Windmueller then went to a wall map to further demonstrate the difference in property value, pointing out, according to Mr. Zuch's testimony, that in the vicinity of Six Mile Road and the Southfield Expressway, blacks had moved in and property values were lower.

Mr. Windmueller recalled the conversation with the plaintiff but denied making any statements regarding race. He admitted stating that property values were lower in Detroit. Ms. Gwendolyn Stulz, the owner of Joy Real Estate Company, also testified and denied that any of her salespersons, to her knowledge, had made any statements regarding race in the conduct of her business. In addition, Mr. Windmueller showed Mr. Zuch a picture of a house in the Rosedale Park area, but thought that Farmington and Livonia were better suited for the needs of the plaintiff, as he understood them, and recommended these to Mr. Zuch. Mr. Windmueller thought that the plaintiff was interested primarily in safety and a place near expressways. Ms. Stulz, on cross-examination, was unable to recall the sale of any suburban home to a black family.

The Court finds in this instance that the evidence is not conclusive that Mr. Windmueller or Joy Real Estate acted in a manner inconsistent with the standards required by the Fair Housing Act. Nevertheless, the Court finds that there is a likelihood that their conduct was inconsistent with 42 U.S.C. § 3604(a).

## 8. MILLER BROS. REAL ESTATE

Miller Bros. Realty Company (Miller Bros.) is a Michigan corporation engaged in the business of listing and selling real estate. Its office is located at 2590 Puritan, Detroit, Michigan. The defendant Werner V. Cohen is a salesperson for Miller Bros.

Leo J. Elliott, a plaintiff in this action and a resident of Northwest Detroit, testified that he visited the office of Miller Bros. on Eight Mile Road in Detroit on June 28, 1972. He was accompanied by George Badeen, a sixteen (16) year old resident of Northwest Detroit. They were assisted at the Miller Bros. office by the defendant Werner Cohen.

Mr. Elliott, dressed in casual clothes and carrying a motorcycle helmet, was posing as a businessperson from Texas. He told Mr. Cohen that he was interested in a large house and indicated that he had seen several houses in the area near the defendant's office which he liked. Mr. Cohen, the manager of the office, took the witnesses into his office near the entrance of the building. There, the defendant is supposed to have mentioned the Detroit housing ordinance and to have told the witnesses that *anywhere* they might live in Detroit they would probably have black neighbors.

According to Mr. Elliott, Mr. Cohen attempted to interest him in a house in Southfield, in spite of his insistence on purchasing a home in Northwest Detroit. The defendant is alleged to have discussed the problems which Detroit was having and noted that the city was ten (10) to twenty (20) percent black. Mr. Elliott also testified that Mr. Cohen told him that he could not sell him a house in Northwest Detroit, even if he wanted to buy one because the area was undergoing racial changes. He said, Mr. Elliott recalled, that to sell him a house there would be an injustice and that he was interested in having Mr. Elliott refer other buyers to him in the future. Mr. Elliott testified that Mr. Cohen showed him homes in a listing book labeled "Southfield.". Mr. Badeen corroborated almost entirely Mr. Elliott's testimony, except that he testified that Mr. Cohen showed them a house in a book which had "Southfield" listed under the picture.

Mr. Cohen testified that he does not sell real estate as office manager and assists customers only if no other salesperson is available. He denied making the statements regarding race. The defendants introduced a listing book into evidence which illustrated the type of book the defendant Miller Bros. issued to their salespersons; it was a single book with the houses listed alphabetically. Mr. Cohen also testified that one-third (⅓) of his full-time staff and two-thirds (⅔) of his part-time staff were black, that two-thirds (⅔) of his customers were black and that most sales in the Grand River office were made in the Detroit area. Less than one (1) percent of his sales represent houses in the suburbs.

The testimony of Mr. Elliott raised very serious questions concerning the conduct of Mr. Cohen, but the nature of the defendant's business as described by Mr. Cohen and the nature of his duties were inconsistent with the plaintiff's testimony. In addition, the plaintiff Elliott testified that Mr. Cohen showed him a book of listings labeled "Southfield" whereas the evidence shows that Miller Bros. is not a member of the multi-listing service and that all of its listings are contained in a single book.

In addition, while Mr. Badeen corroborated the testimony of Mr. Elliott, the Court notes that Mr. Badeen was present in the courtroom when Mr. Elliott testified and that his testimony tended to parallel that of Mr. Elliott's to the point of employing the same words and phrases in key portions.

In view of the inconsistencies between the plaintiff's testimony and the facts which Mr. Cohen disclosed on cross-examination concerning the nature of his business, the Court is reluctant to credit the plaintiff's testimony.

### 9. BOWERS REALTY AND INVESTMENT COMPANY

The defendant Bowers Realty and Investment Company (Bowers) is a Michigan corporation engaged, inter alia, in the business of listing and selling real estate. The defendant Art Watkins was employed as a salesperson by the defendant Bowers at all times relevant to this action.

Ms. Marie Olson, a resident of Detroit and a witness for the plaintiffs, testified that in February, 1973, she was approached at her home by a man who identified himself as a Mr. Gill, a salesperson for the defendant Bowers. Mr. Gill, contrary to fact, is alleged to have told the witness that he had a buyer for her house. Ms. Olson told him that he must have made a mistake since her house was not for sale. The man persisted and finally told the witness that he could get her the money for the house by that night. Ms. Olson protested that her house was not for sale, despite the man's insistence that now was the time to sell while she could still get a good price. There was no further identification of the man other than his having told the witness that he was a Mr. Gill working for the defendant Bowers.

Ms. Olson also testified that a Mr. Marshbank, allegedly employed by Bowers, approached her at her home. According to Ms. Olson, he told her that it was his job to get white families to move into the suburbs so that blacks could move into Northwest Detroit. Mr. Marshbank, who is presently employed by Harrison-Moore, testified that he probably did solicit in the area of Ms. Olson's home but denied making such racial statements. He did not recall having a conversation with the witness.

The Court is of the opinion that there has not been sufficient identification of the men with whom Ms. Olson spoke to hold the defendant Bowers responsible for their conduct.

Ms. Mary Finneren, subpoenaed by the plaintiffs to appear as a witness, testified that she was approached at her home in Northwest Detroit by the defendant Art Watkins on September 28, 1972. She testified that the defendant

asked her if she was interested in selling her home. She told him that she was not. She then accused the defendant of blockbusting, noting that she had read about tactics such as he was employing in the newspaper. Mr. Watkins is reported to have said, "You can't believe everything you read." When the witness informed him that she was not interested in selling her home, he responded, "You will be," and went to the house next door to Ms. Finneren's. This testimony was uncontradicted.

The defendant Bowers is also alleged to have conducted a solicitation campaign in Northwest Detroit involving flyers, telephone calls and door-to-door canvassing. (See discussion, *infra*, at 1045–1046.) The plaintiffs alleged that they made requests to the defendant that these solicitations cease. The defendant denied the allegations but admitted that its agents solicit extensively. Ms. Daralyn Bowers, the manager of Bowers Realty, testified that her agents are trained to solicit listings but that they operate under tight control exerted by the defendant.

### 10. LAWRENCE C. HUMPHREY, d/b/a FOUR STAR REALTY

Lawrence C. Humphrey, d/b/a Four Star Realty is a Michigan real estate brokerage firm engaged in the business of listing and selling real estate. Irvin Corley, Muriel Skinner and Mr. B. Clark are, or were, salespeople employed by Four Star.

Ms. Helen Stockton, a resident of Northwest Detroit, was called by the plaintiffs to testify about a visit to her home on November 7, 1973, by a man identified as Mr. B. Clark, a salesperson for Four Star Realty. Ms. Stockton testified that at approximately 10:45 A.M. her doorbell rang several times. When she answered it, Mr. Clark and an unidentified couple stood at her door. Mr. Clark told Ms. Stockton that he was there for an 11:00 A.M. appointment which she had made with him over the telephone. The witness testified that she had not made such an appointment and that she so informed the defendant. Mr. Clark then checked in his pocket and showed her that he had her address written down. Ms. Stockton asked him if he had her name; he said that he did not. He eventually conceded that a mistake had been made and he told Ms. Stockton that he would return to his office to check the source of the mistake. When Ms. Stockton moved into Northwest Detroit in 1969, one (1) black family lived on her block. At the time of her testimony, four (4) black families lived there. Many of her immediate neighbors, three (3) or four (4) families are retired persons. The testimony of Ms. Stockton was uncontradicted.

Mrs. Mildred Martin, a resident of Northwest Detroit for twenty-five (25) years, testified about a conversation between herself and Muriel Skinner, a salesperson for Four Star. The conversation occurred on July 29, 1972. Ms. Skinner approached the witness while she was working in her yard on the day in question, greeted her and asked if she was interested in selling her house; Mrs. Martin said that she was not. Ms. Skinner then commented on the neighborhood being nice. The witness responded that that was one of the reasons she was not interested in selling her home. Ms. Skinner gave the witness her business card and asked the witness to mention her to anyone she knew who might want to sell his house. Mrs. Martin thought that Ms. Skinner was black.

At the time of this conversation, one (1) black family lived on Mrs. Martin's block; this was the first time that she had been solicited to sell her house. Mrs. Martin, while testifying that she was upset by the conversation, stated that she did not object ordinarily to sales persons asking her if she wanted to sell her house. Ms. Skinner did not testify. Mr. Humphrey, the owner of Four Star, testified that Ms. Skinner was employed by him as a salesperson.

Thomas and Barbara Herrod, residents of Northwest Detroit and plaintiffs in this action, testified about a visit to their home by Irving Corley, a salesperson for Four Star Realty.

Mrs. Herrod testified that on a Sunday afternoon in April, 1972, she and her husband were visited by a man who identified himself as Irving Corley, a salesperson for Four Star Realty. Mr. Corley spoke first to Mrs. Herrod at the latter's door. He asked her if she wanted to list her house. She told him that she did not. He then told her that a black community was being started in her neighborhood and that now was a good time to sell. Property values would go down, he said, and the schools would change. Mr. Herrod, who had been sitting in his living room near the door and had overheard the conversation between Mr. Corley and his wife, came to the door. He told Mr. Corley that they were not interested in selling their house. He said that Mr. Corley made a remark about the neighborhood undergoing a change with black families moving in. Mr. Corley then left. Mr. Corley admitted soliciting in the Herrods' neighborhood but denied making any statements regarding race; he also did not remember the plaintiffs specifically.

## UNREQUESTED SOLICITATION

The plaintiffs have also complained about unrequested mail solicitations from various defendants. These solicitations do not refer to race, but the plaintiffs argue that under the circumstances of the communities' transition from all white to racially integrated, such solicitations convey to the recipients the idea that their communities are becoming unstable. As a result of their tendency to exploit racial fear, solicitations have the effect of speeding up the exodus of white residents from the area. The purpose of the defendants in sending these solicitations is to influence the recipients to sell their homes so that the defendants may thereby profit from such sales.

The kinds of solicitations involved in this action vary. Some contain pictures of the salespeople, some contain phrases designed to appeal to the fear that the residents may have for their personal safety, and others are thinly veiled attempts to appeal to racial prejudice. These solicitations are in the form of letters and cards and are addressed either to specific people or to "occupant." Some are general in their reference to the area in which the recipient lives and others are specific to the point of indicating that the sender has sold a house on the recipient's block.

Many examples of these solicitations were introduced into evidence. One addressed to "resident" carried the legend, "WE THINK YOU MAY WANT A FRIEND FOR A NEIGHBOR . . . KNOW YOUR NEIGHBORS," another, also addressed to "Resident" purported to carry "Neighborhood News" to the recipient. It announced that the real estate agency had just bought a house at a specific address in the recipient's neighborhood, that the named sellers had received cash in the transaction and that the recipient can receive the same services. The plaintiffs have asked the Court to enjoin these solicitations, even though they do not contain any reference to race, because in the atmosphere of racial tension and fear that exists in Northwest Detroit, they have the effect of other more direct attempts to "block-bust" in violation of the Fair Housing Act.

The plaintiffs also allege that various of the defendants have engaged in telephone solicitations in Northwest Detroit. They tried to introduce testimony regarding several of these telephone conversations in which direct references were made to race. The evidence was not admitted to prove that the defendants violated the Act because the plaintiffs could not properly identify the caller; the testimony was admitted for the

limited purpose of showing the racial atmosphere in the area. In addition to calls in which race was mentioned, the plaintiffs also complain of telephone calls in which no mention of race was made but which, under the circumstances, had the effect of exploiting the entry of black families into the area.

### 11. HAYWARD W. RICHARDSON REALTY, INC.

The defendant Hayward W. Richardson Realty, Inc., is a Michigan corporation engaged in the business of listing and selling real estate. Its office is located at 5120 Outer Drive, Detroit, Michigan. The plaintiffs allege that the defendant distributed in the Northwest Detroit area a flyer advertising its services. This flyer contained a photograph of the defendant Hayward W. Richardson, a black man. The defendant introduced into evidence a copy of this flyer and admitted in their answer that it conducted a solicitation campaign in the Northwest Detroit area.

### 12. HARRISON–MOORE REALTY COMPANY

The defendant Harrison-Moore Realty Company is a Michigan corporation engaged in the business of listing and selling real estate. Its office is located at 19640 Grand River, Detroit, Michigan. The plaintiffs alleged that Harrison-Moore conducted a campaign of telephone solicitations in Northwest Detroit, and the defendant admitted that such telephone calls were made. There was no attempt by the plaintiffs to show that these telephone calls made any reference to race.

### II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343(3) and 42 U.S.C. § 3612 to enforce rights under the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq.

2. The defendants in this action, and their agents, are in the business of selling and listing, for a profit, dwellings within the meaning of 42 U.S.C. § 3602(b).

3. The Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. was designed to provide, within constitutional limit, for fair housing throughout the United States, 42 U.S.C. § 3601. Congress' intention in passing the Act was to end the unfairness of racial discrimination forever; it should, therefore, be liberally construed.

Since its passage, the Act has been interpreted to ban *all* racially discriminatory conduct by real estate agents in the sale and rental of housing. Smith v. Sol Adler Realty Co., 436 F.2d 344 (7th Cir. 1971); United States v. Henshaw Brothers, Inc., 1974 P. H. Inc. E. O. H. ¶ 13,657 (E.D.Va.1974); United States v. Mitchell, 327 F.Supp. 476 (N.D.Ga. 1971), Cf. Jones v. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

In *Jones*, the Supreme Court held that an action alleging housing discrimination could be maintained against a private realtor under 42 U.S.C. § 1982. The Court noted, however, that *1982* was not as comprehensive as the Fair Housing Act which, at the time of the *Jones* decision, had just been enacted into law. The difference between § 1982 and Title VIII of the Civil Rights Act of 1968 (Fair Housing Act), the Court stated, is the difference "between, on the one hand, a general statute applicable only to racial discrimination in the rental and sale of property and enforceable only by private parties acting on their own initiative, and, on the other hand, a detailed housing law, applicable to a broad range of discriminatory practices and enforceable by a complete arsenal of federal authority." 392 U.S. at 417, 88 S. Ct. at 2191. The Court continued:

"If Congress has power under the Thirteenth Amendment to eradicate conditions that prevent Negroes from buying and renting property because of their race or color, then no federal

*statute calculated to achieve that objective can be thought to exceed the constitutional power of Congress simply because it reaches beyond state action to regulate the conduct of private individuals."* 392 U.S. at 438–439, 88 S.Ct. at 2203. (Emphasis added.)

In conclusion, the Supreme Court stated the rationale behind broadly interpreting the power exercised by Congress under the Thirteenth Amendment to the United States Constitution:

"At the very least, the freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live. If Congress cannot say that being a free man means at least this much, then the Thirteenth Amendment made a promise the Nation cannot keep." 392 U.S., 443, 88 S.Ct. at 2205.

The United States Court of Appeals for the Fifth Circuit was the first appellate court to rule on the constitutionality of the Fair Housing Act. In holding that the Act was a constitutional exercise of Congressional power under the Thirteenth Amendment, the Court adopted fully the Supreme Court's mandate in *Jones* that Congress' power was to be broadly construed. United States v. Bob Lawrence Realty, Inc., 474 F.2d 115 (5th Cir. 1973) cert. denied 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973). This Court also believes that the Fair Housing Act should be construed as broadly as constitutionally possible if the evils of racial discrimination in housing are to be combated effectively.

4. Section 3604(a) of the Fair Housing Act provides that it shall be unlawful:

"To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin."

■ ■ Steering on a racial basis ("steering") is prohibited by that portion of Section 3604(a) of the Fair Housing Act which makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race." This section makes it unlawful to steer or channel a prospective buyer into or away from an area because of race. Unlawful steering or channeling of a prospective buyer is the use of a word or phrase or action by a real estate broker or salesperson which is intended to influence the choice of a prospective property buyer on a racial basis. United States v. Robbins, 1974 P–H EOH ¶ 13,655 (S.D.Fla.1974). Where choice influencing factors such as race are not eliminated, freedom of choice in the purchase of real estate becomes a fantasy. Coppedge v. Franklin County Board of Education, 273 F.Supp. 289, 298–299 (E.D.N.C.1967), affd., 394 F.2d 410 (4th Cir. 1968); Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D. Ala.1967), aff'd. sub nom., Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967). It is the freedom of choice for the purchaser which the Fair Housing Act protects. Hence, race need not be the sole reason for the defendant's conduct if it is an element of that conduct. Williamson v. Hampton Management Co., 339 F.Supp. 1146, 1147 (N.D.Ill.1972).

■ Accordingly, any action by a real estate agent which in any way impedes, delays, or discourages on a racial basis a prospective home buyer from purchasing housing is unlawful. This is in accord with the position taken in Mayers v. Ridley, 465 F.2d 630, 652–3 (D.C.Cir. 1972), where the Court of Appeals for the District of Columbia stated that the Fair Housing Act was intended to have "the broadest objectives and scope" and to prohibit not only open, direct discrimination but also all practices which have a racially discouraging effect.

It is the opinion of this Court that when a real estate agent actively undertakes an effort to influence the choice of a prospective home buyer on a racial basis, whether on his own initiative or in response to the buyer's initiative, the agent either directly or indirectly discourages the prospective home buyer from purchasing a home in a particular area. Where available housing has been traditionally denied to blacks because of their race, this conduct tends to perpetuate racially segregated communities. The Court, therefore, concludes as a matter of law that steering is a violation of Section 3604(a) of the Fair Housing Law.

On their cross-examination of the plaintiffs' witnesses, the defendants attempted to elicit the admission that, ultimately, the defendants offered to show plaintiffs houses in any part of the city or state in which they had listings. From this, the Court is asked to conclude that for purposes of 42 U.S.C. § 3604(a), the defendants did not make "unavailable dwellings to the plaintiffs because of their race." This conclusion does not follow.

■ What the defendants are asking this Court to find, in effect, is that because of the insistence of the plaintiffs, and the reluctant submission of the defendants, there was no steering because the initial efforts of the defendants failed. Such a conclusion is untenable. The fact that the defendants did not succeed in steering the plaintiffs away from the transitional neighborhoods of Detroit is not relevant; the law makes it unlawful even to attempt. Smith v. Sol D. Adler Realty, 436 F.2d 344, 349–350 (7th Cir. 1971) [". . . race is an impermissible factor in an apartment rental decision and . . . it cannot be brushed aside because it was neither the *sole* reason for discrimination nor the total factor of discrimination. We find no acceptable place in the law for partial racial discrimination."] [Court of Appeals' Emphasis]; Brown v. State Realty Company, 304 F.Supp. 1236, 1241, (N.D.Ga.1969) ["However, the statute does not proscribe against successful efforts alone but equates any 'attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, or national origin' with a successful inducement to do so."] Were it otherwise, the damage to be done by steering would have to be inflicted first before the actions could be challenged. Such a requirement would fail to serve the purpose of the Act.

The Court in United States v. Gilman, 341 F.Supp. 891, 903 (S.D.N.Y.1972), stated the rule which should guide federal courts in protecting the rights of American citizens in this and all other cases:

"Where discrimination is obvious it must be halted immediately. However, discrimination is not always apparent or overt but often appears in insidious and subtle forms. *Denigration of individual rights and liberties is the hallmark of discrimination and cannot be permitted to exist under any guise.*" (Emphasis added.)

Finally, the defendants have sought to argue that the plaintiffs failed to prove that the areas into which the real estate salespeople attempted to steer them were "all white." The Court finds no merit in this argument. The operative factor which makes the defendants' conduct unlawful was their trying to influence the "buyer's" decision by the use of race. Whether the area to which they attempted to steer the plaintiffs was all white is, therefore, not relevant.

5. Section 3604(e) of the Fair Housing Act makes it unlawful:

"For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons

of a particular race, color, religion, or national origin."

 The purpose of this section is to prevent individuals from preying upon the fears of property owners in racially transitional areas and thereby inducing the kind of panic selling which results in community instability. United States v. Mitchell, 327 F.Supp. 476, 479 (N.D.Ga.1971). In construing the term "representation" as used in § 3604(e), this Court recognizes that each provision of the Fair Housing Act is to be given a liberal construction in order for it to accomplish its purpose. In that regard, the representations prohibited by Section 3604(e) include the subtle, as well as the more obvious, forms of racial inducements to sell. It is possible, therefore, for a representation to be a violation of the section even if race is not explicitly mentioned. See United States v. Mintzes, 304 F.Supp. 1305 (D. Md.1969).

 Section 3604(e), therefore, is aimed at both overt "blockbusting" and other uninvited solicitations in racially transitional neighborhoods where it can be established (1) that the solicitations are made for profit, (2) that the solicitations are intended to induce the sale of a dwelling, and (3) that the solicitations would convey to a reasonable man, under the circumstances, the idea that members of a particular race are, or may be, entering the neighborhood.

It is a well known fact that racial tensions and anxieties are generated when blacks move into previously all-white neighborhoods. It is also well known that many real estate agencies attempt to exploit such a situation by making repeated, uninvited solicitations for the sale of homes. In most instances, this activity (commonly referred to as "blockbusting") has proven to be an effective means of stimulating the sale of homes in racially transitional neighborhoods. It does so by capitalizing upon the racial fears of whites, reminding them that blacks are moving into the

area. The process was articulated quite clearly in United States v. Mitchell, 335 F.Supp. 1004, 1005–1006 (N.D.Ga.1971), where the United States District Court for the Northern District of Georgia stated:

"The evidence at the trial disclosed many illuminating things about what happens in a residential neighborhood when it becomes racially transitional. For example, if these cases are typical —and the court believes they are—the following consequences can be predicted as inevitable, and beyond dispute: First, a sense of panic and urgency immediately grips the neighborhood and rumors circulate and recirculate about the extent of the intrusion (real or fancied), the effect on property values and the quality of education. Second, there are sales and rumors of sales, some true, some false. Third, the frenzied listing and sale of houses attracts real estate agents like flies to a leaking jug of honey. Fourth, even those owners who do not sell are sorely tempted as their neighbors move away, and hence those who remain are peculiarly vulnerable. Fifth, the names of successful agents are exchanged and recommended between homeowners and frequently the agents are called by the owners themselves, if not to make a listing then at least to get an up-to-date appraisal. Constant solicitation of listings goes on by all agents either by house-to-house calls and/or by mail and/or by telephone, to the point where owners and residents are driven almost to distraction.

In this maelstrom the atmosphere is necessarily charged with Race, whether mentioned or not, and as a result there is very little cause or necessity for an agent to make direct representations as to race or as to what is going on. On the contrary both sides already know, all too well, what is going on. In short, for an agent to get a listing or make a sale *because* of racial tensions in such an area is rela-

tively easy, whereas the direct mention of race in making the sale is superfluous and wholly unnecessary." (Emphasis by the Court.)

This Court is well aware of the racial fears which exist in a community into which black families are entering for the first time. The testimony in this action has underscored the instability which results from these fears, and it is this instability upon which the real estate industry preys. As the Court observed in Brown v. State Realty Company, 304 F.Supp. 1236, 1240 (N.D.Ga. 1969):

> "The practices condemned by the provision (the Fair Housing Act) impede the rights granted in § 1982 and constitute a fundamental element in the perpetuation of segregated neighborhoods, racial ghettos and the concomitant evils which have been universally recognized to emanate therefrom. Such iniquitous conduct, trafficking as it does on the fears of whites and the desperation of Negroes, clearly affects equality in housing and is abhorred by all citizens, regardless of their personal views on the racial question."

For the protection afforded by the Fair Housing Act to be effective, real estate salespeople must not be allowed to make *any* representation which would violate 42 U.S.C. § 3604(e). The effect of this may be to forestall the entry of black families into a community, but that is preferable to the alternative: A segregated community created and perpetrated by unscrupulous, or even innocent, real estate agents exploiting the racial fears and hatreds of those who live in the community, or those who might seek to live there. This Court agrees with the Court of Appeals for the Seventh Circuit which, in response to the argument that a total ban on "For Sale" signs in Gary would make it more difficult for blacks to move into previously all white neighborhoods, stated:

> "The right to open housing means more than the right to move from an old ghetto to a new ghetto. Rather, the goal of our national housing policy is to 'replace the ghettos' with 'truly integrated and balanced living patterns' for persons of all races. Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415. It is clearly consistent with the Constitution and federal housing policy for Gary to pursue a policy of encouraging stable integrated neighborhoods and discouraging brief integration followed by prompt resegregation, even if an effect of that policy is to reduce the number of blacks moving into certain areas of the city. See Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973); Shannon v. United States Department of Housing and Urban Development, 436 F.2d 809 (3d Cir. 1970). The NAACP Legal Defense and Educational Fund as amicus curiae has argued that '[H]ere a legislative body has acted to balance individual and collective interests to ensure constitutionally mandated open housing' and that 'The interest of both the black and white citizens in stable communities outweighs any minor inconvenience of having to utilize alternate methods for advertisement and information gathering' (Br. 16). We agree . . ." Barrick Realty, Inc. v. City of Gary, Indiana, 491 F.2d 161, 164–165 (7th Cir. 1974).

■ 6. The plaintiffs have alleged that in several instances the defendants refused to deal with prospective "buyers" because they were black. In each of the instances complained of, however, the "buyer" was in fact a tester. In order for a "refusal to deal" to occur, the plaintiff must be a bona fide purchaser; this is clear from the language of the statute. 42 U.S.C. § 3604(a).

■ However, conduct which does not constitute a "refusal to deal" within the meaning of 42 U.S.C. § 3604(a) be-

cause of the involvement of testers may nevertheless constitute unlawful steering as that term is defined by this Court, *supra*, at 1047.

7. The defendants, throughout the ten (10) weeks of hearings and in their post-hearing briefs, emphasized that all of the witnesses, with the exception of Mr. Michael Secord, were testers. This is irrelevant. There is no requirement in the Fair Housing Act that the prospective buyer, except in the case of a refusal to deal, be a bona fide purchaser. See, United States v. Youritan Construction Company, 370 F.Supp. 643, 650 (N. D.Cal.1973).

The evidence resulting from the experience of testers is admissible to show discriminatory conduct on the part of the defendants. The Fair Housing Act of 1968 was intended to make unlawful simpleminded as well as sophisticated and subtle modes of discrimination. It is the rare case today where the defendant either admits his illegal conduct or where he sufficiently publicizes it so as to make testers unnecessary. For this reason, evidence gathered by a tester may, in many cases, be the only competent evidence available to prove that the defendant has engaged in unlawful conduct. Johnson v. Jerry Pals Real Estate, 485 F.2d 528 (7th Cir.1973); United States v. Youritan Construction Company, 370 F.Supp. 643 (N.D.Cal.1973) and cases cited therein at 650; Williamson v. Hampton Management Co., 339 F.Supp. 1146 (N.D.Ill.1972); and Newbern v. Lake Lorelei, 308 F.Supp. 407 (S.D.Ohio 1968).

·The Court's observation in *Newbern, supra,* is particularly appropriate here:

"The defendants liken (a tester) to an informer in a criminal case. However, even in a criminal case—let alone in ·a civil case—the testimony of an informer is competent (although it should be considered with caution). Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270; and there is no entrapment if the informer merely furnishes 'a favorable opportunity.' Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462." 308 F.Supp., at 415.

8. The defendants have also raised objections to the testimony of several witnesses because the witnesses initiated either the contact with the realtor or the discussion of race. This is irrelevant. As the Court in Brown v. State Realty, *supra,* 304 F.Supp. at 1241, stated:

"Nor does the fact that contact with the agents was initiated in some cases by the property owners or that the subject of Negro purchasers was in some cases first raised by the property owners change the result. The conduct condemned and the responsibility placed by the statute on the agent is to refrain absolutely from any such representations." [11]

9. The discriminatory conduct of the real estate salespersons is attributable to the real estate agency under the doctrine of *respondeat superior* and because the duty to obey the law is nondelegable. Sanborn v. Wagner, 354 F. Supp. 291 (D.Md.1973); Williamson v.

---

11. Whether race can ever be discussed in a real estate transaction is not decided here. The testimony herein shows conclusively that the defendants clearly went beyond any reasonable discussion of race which might be lawfully permissible. Cf. United States v. Mintzes, 304 F.Supp. 1305, 1312 n. 3 (D. Md.1969).

The Court is aware, however, of at least one (1) federal court which has held that buyer-initiated discussions of race may absolve the real estate salesperson of liability under the Fair Housing Act of 1968. United States v. Saroff, 377 F.Supp. 352, 361 (E. D.Tenn.1974). This Court is of the opinion that the *Saroff* Court did not correctly interpret the law in light of its purpose, and inasmuch as that case cannot be distinguished from the present action, its holding is here rejected.

Hampton Management Co., 339 F.Supp. 1146 (N.D.Ill.1972). This is especially true where, as here, all of the real estate agencies operated within the area in question and, therefore, were aware of the transitional nature of the communities in question.

■ 10. Injunctive relief is appropriate in this case in order to insulate the community from any further exploitation by these defendants during the pendency of this action. Injunctive relief is a severe remedy and should be granted in only the most extreme situations. The Court is convinced that this is such an extreme situation. The Court must necessarily balance the harm to the defendants against the harm to the public if the injunction is not granted. By this decision, therefore, the Court has concluded that the public interest is paramount.

In addition, of course, the Court has decided that there is a sufficient probability that the plaintiffs will succeed on the merits of the action, and that if an injunction is not issued, there is almost a certainty of irreparable harm to the plaintiffs. Pride v. Community School Board of Brooklyn, New York School Board # 18, 482 F.2d 257 (2d Cir. 1973).

## III. SPECIFIC CONCLUSIONS OF LAW

A. *Violations of 42 U.S.C. § 3604(a).*

■ The following conduct constituted violations of 42 U.S.C. § 3604(a):

1. The Conduct of Bernard O'Laughlin as agent of Lexington House Realty testified to by James Irvin.

2. The conduct of Roy M. Wilson, III, agent of Brian Hussey, d/b/a Earl Keim Realty of Detroit, testified to by Richard Cartwright.

3. The conduct of Ben B. Miller, agent of C. Schuett Realty, Inc., testified to by Frank X. O'Keefe.

4. The conduct of James Brady, agent of John H. Hussey Co., testified to by Mike Secord.

5. The conduct of Virginia Greenwood, agent of Brian Hussey, d/b/a Earl Keim Realty of Detroit, testified to by Ernest Bago.

6. The conduct of Mark Zehnder, agent of Joe E. Norwood Company No. 1, testified to by Vincent Zuch.

7. The conduct of Arnold Windmueller, agent of Joy Real Estate Company, testified to by Vincent Zuch, subject to the limitation noted by the Court, *supra*, at page 1042.

8. The conduct of Bill Willis, an agent of Mayfair Realty, testified to by Vincent Zuch.

9. The conduct of Jim McNish, an agent of John H. Hussey Company, testified to by Vincent Zuch.

B. *Violations of 42 U.S.C. § 3604(e).*

· The following conduct constituted violations of 42 U.S.C. § 3604(e):

1. The conduct of Irwin Corley as agent of Lawrence Humphrey, d/b/a Four Star Realty, testified to by Barbara and Thomas Herrod.

2. The conduct of Mr. Clark, agent of Lawrence Humphrey, d/b/a Four Star Realty, testified to by Helen Stockton.

3. The conduct of Artincus Watkins, agent of Bowers Realty & Investment Company, testified to by Mary Finneren.

4. In view of the foregoing conclusions of law and findings of facts, the Court concludes as matter of law that the racial atmosphere in the area in question is such that a solicitation for a listing, made for profit and with the intention of inducing the sale of a dwelling, would convey to a reasonable man the idea that members of a particular race are or may be entering the area in question, and thus violate 42 U.S.C. § 3604(e). This is so even though race is

not mentioned in the solicitation. Therefore, the solicitations by Haywood W. Richardson Realty, Inc. and Harrison-Moore Realty Company constituted violations of 42 U.S.C. § 3604(e).

### C. *No Cause of Action.*

The following allegations made in the Complaint are not supported by any credible evidence:

1. Paragraph 7.16 of the Complaint alleges:

"On or about June 28, 1972, defendant W. V. Cohn, acting within the scope of his employment by and at the offices of defendant Miller, for profit, attempted to steer and channel plaintiff Leo J. Elliott, because he is white, to an all-white suburban area and made unavailable to him dwellings in Northwest Detroit. This conduct by defendants Miller and Cohn was steering in violation of 3604(a)."

This is the only allegation involving conduct by the defendants Cohn and Miller Bros. The Court, after hearing the testimony of the witnesses, finds that this allegation is not supported.

2. Paragraph 7.25 of the Complaint alleges:

"Grand Oaks Realty (defendant Jackson) regularly sends large numbers of black employees to listed homes in racially transitional neighborhoods after dark, where they mill about the property and purportedly examine the house with flashlights. While this activity does not include any statement of race, the entire atmosphere is charged with racial tensions making direct mention of race unnecessary, and the result is a sense of panic and urgency and racial rumors flood the area. These activities constitute blockbusting in violation of 3604(a) which affects not only the immediate area, but all of the Detroit Metropolitan Area."

This is the only allegation involving conduct by the defendant Frank Jackson, d/b/a Grand Oaks Realty. There was only a vague reference to this allegation at the hearing, and the Court finds that the allegation is not supported.

### IV. SUMMARY

This Memorandum Opinion and Order represents only a stage, and not the end, of what has been a long and grueling piece of litigation. What ultimate effect this, or any litigation, can have in reversing racial segregation in housing in Detroit is impossible to predict. We are not dealing simply with conduct which can be legally regulated. The issues before the Court are complicated by conduct and attitudes of people of the city which cannot be reached by laws or the Court.

What is important at this point is that justice is served by the Court's decision. It is the duty of the courts to see that justice is accomplished by interpreting the laws and upholding their principles in a manner which is consistent with the promises of our Constitution; but the courts must also guard against their own misuse. Careful consideration must be given to each case to assure that the temporal results of today do not result in grave injustices in the future. There are some things which need to be done, but which courts are ill equipped to do. Fear cannot be enjoined. Perhaps if there were no fear, there would be no need for this action, no need for a Fair Housing Act. But we must proceed from what is reality. There is fear, and in the minds of some of the people of Northwest Detroit, it is as real as the blackness of the skins of the people whom they fear. These fears raise problems with which we must deal, but this totality cannot be dealt with here. We must be satisfied, today, to do what under the circumstances and the law seems fair and just.

In entering its Opinion and Order, the Court is mindful of the contention of some people that black and white people are incapable of living together in peace

and harmony in close proximity to one another. But certainly it is conceivable that in a city of the size of Detroit, racially integrated neighborhoods can evolve and sustain themselves. For there are enough fair-minded people of both races, who have respect for diversity, to insure that there will indeed be integrated, or at least desegregated, neighborhoods—neighborhoods where people will live because they want to, not because they have to.

Such neighborhoods can only exist when the black and white inhabitants of those neighborhoods develop mutual respect and tolerance. Such respect and tolerance is more likely to thrive in an atmosphere where people who affirmatively desire to live in a community are not continually subjected to the pressures of doomsday prophets making repeated representations that their property values as well as the quality of education offered their children will decline. Even white people who would not have wanted to sell their homes frequently feel forced to sell and move to neighborhoods where blacks are not encouraged to become residents or homeowners.

The activities of the defendants as determined herein cannot be countenanced. These defendants cannot be permitted to decide where the citizens of Detroit can and cannot live. This Court cannot compel people of different races to live together in any neighborhood. However, this Court does have the responsibility under the law, when presented with the evidence that is of record in this case, to take appropriate measures to see that realtors who are *predatory intruders* in neighborhoods where they transact business are not free to propagandize residents of those neighborhoods with the idea that they should sell their homes and move because of the changing racial composition of the neighborhood.

In a sense, this action is symptomatic of long-term racial separation. Myths and stereotypical conceptions which become cemented in the mind with the passing of time cannot easily be dispelled when people begin to act on the resulting fears. The people in Northwest Detroit flee to the suburbs in great numbers when their fears are aroused by rumors of the entry of black families into their neighborhoods. The real estate industry, while perhaps not the only factor, acts as a catalyst in this cancerous process.

The record in this case is replete with credible testimony which leads this Court to the unavoidable conclusion that flagrant violations of the Fair Housing Act have occurred. The evidence substantiating plaintiffs' charges of illegal activity by the defendants in real estate transactions is all the more disturbing because the illegal activity was motivated largely, if not entirely, by the defendants' desire for profit. When viewed in terms of the resulting consistent pattern of practices resorted to by the defendants, their desire for profit assumed unconscionable proportions. The defendants herein have acted in total disregard of the right of black and white people to enter into important contracts affecting real property without harassment, undue pressure and inflammatory appeals to racial fear and prejudice. That lack of concern is reflected by the manner in which the defendants have manipulated the housing market by the racially biased nature of their appeals to homeowners and home buyers and the unabashed way in which they have sought to disturb the racial balance in Detroit neighborhoods.

By its Order today, the Court realizes that it may place the named defendants over whom it has jurisdiction at a competitive disadvantage vis-a-vis other real estate agencies and sales people who operate in Northwest Detroit, but who are not parties to this action.[12] The Court

---

12. One of the ironies of this suit is that among the defendants are several black real estate agencies that will now be enjoined from providing a service which in the past

hopes, however, that the unequivocal language of this Order will give pause to any agent or salesperson who would seek to operate within the defined area in a manner inconsistent with the injunction issued herein. The Court points out that although it has not yet decided the issue, this action was brought as one involving a class of defendants. Any attempt by a real estate agent or salesperson to exploit this order will, of course, have a bearing on whether the Court ultimately certifies a defendant class.

Violations of law in the area of human rights are to be frowned upon even when the perpetrators of such violations are acting out of personal racial prejudice which is the product of social conditioning; such violations are even more intolerable, as in the case of these defendants, when the perpetrators are not necessarily acting out their own personal racial prejudices, but are vigorously seeking to exploit the racial prejudices of others in order to satisfy their commercial greed. The illegal activities of the defendants are particularly invidious in a case such as the one here presented. This Court, supported by a record containing convincing evidence of violations of law, will take whatever measures provided for under the law to put a stop to the defendants' conduct and to implement the intent of Congress as embodied in the Fair Housing Act.[13]

## ORDER

### I

Pursuant to the foregoing Findings of Fact and Conclusions of Law, it is hereby ordered that the defendants Earl Keim Realty, C. Schuett Realty, John H. Hussey Realty, Joe E. Norwood Co., No. 1, Joy Realty Estate, Mayfair Realty, Lexington House Realty, Four Star Realty, Bowers Realty, Haywood W. Richardson Realty, and Harrison-Moore Realty, and their owners, officers, agents, employees, successors and all persons in active concern or participation with any of them, are temporarily enjoined with re-

---

their clients were unable to obtain from white real estate agencies. The Court notes that until 1950, the National Association of Real Estate Boards (NAREB) counseled its members to maintain segregated neighborhoods in the interest of maintaining property values. The Code of Ethics of the NAREB provided until then that:

"A REALTOR SHOULD NEVER BE INSTRUMENTAL IN INTRODUCING INTO A NEIGHBORHOOD A CHARACTER OF PROPERTY OR OCCUPANCY, MEMBERS OF ANY *RACE OR NATIONALITY*, OR ANY INDIVIDUALS WHOSE PRESENCE WILL CLEARLY BE DETRIMENTAL TO PROPERTY VALUES IN THAT NEIGHBORHOOD." (Emphasis added).

While the Code no longer contains a reference to race or nationality, the testimony in this case indicates that white realtors still will not consistently introduce black families into predominantly white communities unless they perceive that the neighborhoods are "changing."

Compounding this situation is the fact that because white home-owners do not generally patronize black relators, the black relator is limited in his operations to either predominantly black communities or transitional communities. In attempting to generate business, therefore, he must rely a great deal on the white realtors to initiate the block busting process. He then follows into the area, and, even when his conduct is within the limits of the law, the effect of his presence, many times, is to speed the racial transition of the area. In a sense, therefore, this preliminary injunction while necessary, is also somewhat unfair to these defendants. Its effect will be to limit again the areas in which they can operate with any hope of being successful.

13. Proof of actual profits obtained from sales which are found to be in violation of the Fair Housing Act may, as an appropriate remedy, result in a court order to the defendants that they disgorge such profits. No defendant can, without also violating the sanctity of the legal process, be allowed to retain moneys which were obtained as a result of illegal and unconstitutional conduct. Any profits ordered forfeited for this reason could then be used in ways to implement the goals of the Act.

spect to the operation of their business from:

1. Representing to any homeowner, for the purpose of obtaining a real estate listing, that members of a particular race, color, religion, or national origin are entering, have entered, or will soon be entering his community.

2. Steering or channelling any prospective purchaser toward residence in any particular dwelling or neighborhood because of race, color, religion or national origin.

3. Soliciting from any person, in any manner, listings for the sale of residential real estate in the area of 7 Mile Road to 6 Mile Road (McNichols) between the Southfield Freeway and Heyden Street, and from 6 Mile Road (McNichols) to Accacia Street between the Southfield Freeway and Evergreen Road other than by advertisements on television, radio and billboards, in telephone directories or in regularly published newspapers not devoted primarily or exclusively to real estate or in other directories not distributed primarily for the purpose of real estate solicitation to homeowners.

This is intended specifically to enjoin all telephonic, personal and mail solicitations of individual homeowners at their residences which are initiated by real estate agents.

4. Making, printing or publishing or causing to be made printed, or published, any notice, statement, or advertisement, with respect to the sale of a dwelling that indicates any preference, limitation, or discrimination based on race, color, or national origin.

5. Representing to any person because of race, color, or national origin that any dwelling is not available.

6. Making, printing, or publishing, or causing to be made, printed, or published, any notice, statement, or advertisement, with respect to the operation of the defendants' business which includes any racial, or ethnic references, by photograph, representation, or otherwise.

## II

It is further ordered that John H. Hussey Company; Joy Realty Estate Company; Earl Keim Realty of Detroit, Inc.; Mayfair Realty Co.; C. Schuett Realty, Inc.; Joe E. Norwood No. 1, Inc.; and Lexington House Realty and their owners, officers, agents, employees, successors and all persons in active concern or participation with any of them, shall forthwith adopt and implement an affirmative program of compliance with the provisions of the Fair Housing Act in order to insure that during the pendency of this matter all housing sold or obtained for listing will be made available to black and other nonwhites on the same basis that they are made available to whites and that housing in all areas of the defendants operation will be made available to all persons on an equal basis regardless of the color or race of the prospective buyers or sellers. Such program shall include, but need not be limited to, the following:

A. The defendants shall, within 30 days of the entry of this Order, conduct an educational program for its sales personnel and other agents and employees to inform them of the provisions of this Order and their duties under the Fair Housing Act. Such program shall include the following:

1. A copy of this Order shall be furnished to each agent and employee.

2. By general meeting or individual conference the defendants shall inform each agent and employee of the provisions of this Order and of the duties of the defendants and their agents and employees under the Fair Housing Act. Each agent and employee shall also be informed that his failure to comply with the provisions of this Order shall subject him to dismissal or other appropriate disciplinary action.

3. Each agent and employee shall sign a statement that he has read this

Order and that he fully understands his responsibilities thereunder.

4. The above stated program shall be given within 15 days of the filing of this Order, and thereafter, upon the hiring of any new employee, within 3 days of the commencement of his duties.

B. The defendants shall inform the public generally and their customers and clients specifically of the defendants' nondiscriminatory policy by the following actions:

1. The defendants shall cause a Fair Housing sign in the form attached as Appendix A to be prominently displayed in a place clearly visible to all persons in, or immediately outside, each office of said defendants where there is sale activity. The sign shall be in accordance with the Department of Housing and Urban Development "Fair Housing Poster" regulation, 37 Fed.Reg. 3429–3430 (February 6, 1972), a copy of which is appended as Appendix B to this Order.

2. All advertising of property offered for sale or advertising seeking property to sell by defendants in newspapers or other media including the radio and TV and in billboards, pamphlets, brochures, handouts, and writings of any kind, shall include a statement [14] prominently placed and easily legible to the effect that all property listed by defendants is for sale to all persons without regard to race, color, religion or national origin. In radio advertisement, the equal opportunity statement shall be easily audible.

C. The defendants, in advertising property which they have available for sale, shall do so in a manner which indicates to the public the range of properties available and the range of locations available. This should include in advertisements use of a representative sample of available property.

D. The defendants shall adopt and implement written nonracial standards for receiving, processing, evaluating, approving and selling dwellings (hereinafter "Sale Standards."). The Sale Standards shall be based on objective criteria and shall be designed to extend the defendants' services to all persons without regard to race, color or national origin. A copy shall be filed by each defendant with the Court, and copies served on the plaintiffs within 30 days after the effective date of this Order.

Plaintiff shall have twenty days from receipt of these standards and procedures to file objections with the Court. If plaintiff files no objections, and if the Court makes no contrary ruling sua sponte, these standards and procedures shall be adopted without further order of the Court.

### III

It is further ordered that

A. In the event of a dispute under this Order, any party named in this Order may apply to the Court for direction and resolution of such dispute, upon giving of reasonable notice to the other parties.

B. Any racial records kept by any defendant for the purpose of demonstrating compliance with this Order shall not be considered discriminatory.

C. The Court retains jurisdiction of this action for all purposes.

### IV

It is further ordered that the Complaint be, and the same hereby is, dismissed as to the defendants W. V. Cohn, Miller Bros. Realty Company and Frank Jackson, d/b/a Grand Oaks Realty.

It may become necessary in the future to order provisions for reporting and record keeping, but the Court does not want to impose those burdens on the defendants at this point. The measures which have been ordered are strong, but the alternative of further exploitation and inflammation of racial tensions makes this remedy imperative.

The provisions of this Order shall remain in effect until further ordered by the Court.

---

14. This statement shall include use of the HUD "Equal Housing Opportunities" logo-type and slogan.

APPENDIX A

## EQUAL HOUSING OPPORTUNITY

## We Do Business in Accordance With the Federal Fair Housing Law

(Title VIII of the Civil Rights Act of 1968)

## IT IS ILLEGAL TO DISCRIMINATE AGAINST ANY PERSON BECAUSE OF RACE, COLOR, RELIGION, OR NATIONAL ORIGIN

- In the sale or rental of housing or residential lots
- In advertising the sale or rental of housing
- In the financing of housing
- In the provision of real estate brokerage services

Blockbusting is also illegal

Anyone who feels he has been discriminated against should send a complaint to:

U.S. Department of Housing and Urban Development
Assistant Regional Administrator for Equal Opportunity
Region V
300 South Wacker Drive
Chicago, Illinois 60606
 or
U.S. Department of Housing and Urban Development
Assistant Secretary for Equal Opportunity Washington, D.C. 20410

## Title 24—Housing and Urban Development

# PART 110—FAIR HOUSING POSTER

**Subpart A—Purpose and Definitions**

Sec.
110.1 Purpose.
110.5 Definitions.

**Subpart B—Requirements for Display of Posters**

110.10 Persons subject.
110.15 Location of posters.
110.20 Availability of posters.
110.25 Description of posters.

**Subpart C—Enforcement**

110.30 Effect of failure to display poster.

AUTHORITY: The provisions of this Part 110 are issued under section 7(d) of the Department of Housing and Urban Development Act of 1965 (42 U.S.C. 3535(d)).

SOURCE: The provisions of this Part 110 appear at 37 F.R. 3439, Feb. 16, 1972, unless otherwise noted.

**Subpart A—Purpose and Definitions**

§ 110.1 Purpose.

The regulations set forth in this part contain the procedures established by the Secretary of Housing and Urban Development with respect to the display of a fair housing poster by persons subject to sections 804–806 of the Civil Rights Act of 1968, 42 U.S.C. 3604–3606.

§ 110.5 Definitions.

(a) "Department" means the Department of Housing and Urban Development.

(b) "Discriminatory housing practice" means an act that is unlawful under sections 804, 805, or 806 of title VIII.

(c) "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

(d) "Family" includes a single individual.

(e) "Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcy, receivers and fiduciaries.

(f) "Secretary" means the Secretary of Housing and Urban Development.

(g) "Fair housing poster" means the poster prescribed by the Secretary for display by persons subject to sections 804–806 of the Civil Rights Act of 1968.

(h) "The Act" means title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3601 et seq.

(i) "Person in the business of selling or renting dwellings" means a person as defined in section 803(c) of the Act.

**Subpart B—Requirements for Display of Posters**

§ 110.10 Persons subject.

(a) Except to the extent that paragraph (b) of this section applies, all persons subject to section 804 of the Act, Discrimination in the Sale or Rental of Housing, shall post and maintain a fair housing poster as follows:

(1) With respect to a single-family dwelling (not being offered for sale or rental in conjunction with the sale or rental of other dwellings) offered for sale or rental through a real estate broker, agent, salesman, or person in the business of selling or renting dwellings, such person shall post and maintain a fair housing poster at any place of business where the dwelling is offered for sale or rental.

(2) With respect to all other dwellings covered by the Act:

(i) A fair housing poster shall be posted and maintained at any place of business where the dwelling is offered for sale or rental, and

(ii) A fair housing poster shall be posted and maintained at the dwelling, except that with respect to a single-family dwelling being offered for sale or rental in conjunction with the sale or rental of other dwellings, the fair housing poster may be posted and maintained

## Ch. I—Office of Asst. Secy., Equal Opportunity

at the model dwellings instead of at each of the individual dwellings.

(3) With respect to those dwellings to which subparagraph (2) of this paragraph applies, the fair housing poster must be posted at the beginning of construction and maintained throughout the period of construction and sale or rental.

(b) This part shall not require posting and maintaining a fair housing poster:

(1) On vacant land, or

(ii) At any single-family dwelling, unless such dwelling

(a) Is being offered for sale or rental in conjunction with the sale or rental of other dwellings in which circumstances a fair housing poster shall be posted and maintained as specified in paragraph (a)(2)(ii) of this section, or

(b) Is being offered for sale or rental through a real estate broker, agent, salesman, or person in the business of selling or renting dwellings in which circumstances a fair housing poster shall be posted and maintained as specified in paragraph (a)(1) of this section.

(c) All persons subject to section 805 of the Act, Discrimination in the Financing of Housing, shall post and maintain a fair housing poster at all their places of business which participate in the financing of housing.

(d) All persons subject to section 806 of the Act, Discrimination in the Provision of Brokerage Services, shall post and maintain a fair housing poster at all their places of business.

§ 110.15 Location of posters.

All fair housing posters shall be prominently displayed so as to be readily apparent to all persons seeking housing accommodations or financial assistance or brokerage services in connection therewith as contemplated by sections 804–806 of the Act.

§ 110.20 Availability of posters.

All persons subject to this part may obtain fair housing posters from the Department's regional and area offices. A facsimile may be used if the poster and the lettering are equivalent in size and legibility to the poster available from the Department.

§ 110.25 Description of posters.

(a) The fair housing poster shall be 11 inches by 14 inches and shall bear the following legend:

---

**EQUAL HOUSING OPPORTUNITY**

We Do Business in Accordance With the Federal Fair Housing Law

(Title VIII of the Civil Rights Act of 1968)

**IT IS ILLEGAL**

**TO DISCRIMINATE AGAINST ANY PERSON BECAUSE OF RACE, COLOR, RELIGION, OR NATIONAL ORIGIN**

• In the sale or rental of housing or residential lots.
• In advertising the sale or rental of housing.
• In the financing of housing.
• In the provision of real estate brokerage services.
• Blockbusting is also illegal.

Anyone who feels he has been discriminated against should send a complaint to:

U.S. Department of Housing and Urban Development, Assistant Secretary for Equal Opportunity, Washington, D.C. 20410

or

HUD Region or

[Area Office stamp]

(b) The Assistant Secretary for Equal Opportunity may grant a waiver permitting the substitution of a poster prescribed by a Federal financial regulatory agency for the fair housing poster described in paragraph (a) of this section. While such waiver remains in effect, compliance with the posting requirements of such regulatory agency shall be deemed compliance with the posting requirements of this part. Such waiver shall not affect the applicability of all other provisions of this part.

**Subpart C—Enforcement**

§ 110.30 Effect of failure to display poster.

Any person who claims to have been injured by a discriminatory housing practice may file a complaint with the Secretary pursuant to Part 105 of this chapter. A failure to display the fair housing poster as required by this part shall be deemed prima facie evidence of a discriminatory housing practice.