774 F.2d 135
 HEIGHTS COMMUNITY CONGRESS, on behalf of itself and all
black and white persons residing in Cleveland Heights, Ohio;
City of Cleveland Heights, Ohio, Plaintiffs-Appellees
(84-3427), Plaintiffs-Appellants (84-3442),
v.
HILLTOP REALTY, INC.; Vincent Aveni; and Bruce Johanns,
Defendants-Appellants (84-3427),
Defendants-Appellees (84-3442).
 Nos. 84-3427, 3442.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 4, 1985.
Decided Oct. 2, 1985.
 
 Anthony J. DiVenere (argued), Burke, Haber & Berick, Richard A. Dean, Arter & Hadden, Cleveland, Ohio, for Hilltop Realty, Inc.
 Harvey B. Bruner, Bruner & Shaffan, Cleveland, Ohio, for Johanns.
 Donald K. Barclay (argued), Kathryn Gonser Eloff, Avery S. Friedman (argued), Cleveland, Ohio, for Heights Community Congress.
 Before MERRITT and KENNEDY, Circuit Judges; and PHILLIPS,* Senior Circuit Judge.
 CORNELIA G. KENNEDY, Circuit Judge.
 
 
 1
 Defendants appeal the District Court's declaratory judgment that they engaged in racial steering on eight occasions, in violation of Title VIII of the Civil Rights Act of 1968, otherwise known as the Fair Housing Act, 42 U.S.C. Sec. 3604(a) (otherwise denying housing because of race), and on one occasion in violation of Sec. 3604(c) (making statement indicating racial preference in housing); and blockbusting by mail solicitation on one occasion in violation of Sec. 3604(e) (inducing sale for profit by representation involving race).[1] Plaintiffs are the City of Cleveland Heights (City or Cleveland Heights) and the Heights Community Congress (HCC), an umbrella organization of civic groups that monitors compliance with the fair housing laws. In addition to declaratory relief, the District Court awarded HCC $1 in nominal damages, but declined to grant injunctive relief. Defendants Hilltop Realty, Inc. (Hilltop) and Bruce Johanns, a Hilltop agent, appeal the court's findings that they violated the Fair Housing Act and the awarding of nominal damages; plaintiffs appeal from the court's denial of injunctive relief. We reverse the District Court's finding that defendants violated Sec. 3604(e); in all other respects, we affirm.
 
 I.
 
 2
 Cleveland Heights, a municipal corporation organized under Ohio law, is a suburb of the City of Cleveland, bounded by Cleveland on the west, East Cleveland and Cleveland on the north, South Euclid and University Heights on the east, and Shaker Heights on the south. The City had a population of 57,767 in 1970 and 56,438 in 1980. Black residents comprised 2.5% of its population in 1970 and 24.9% in 1980, with greater concentrations of blacks in areas adjacent to East Cleveland, which had a black population of 58.6% in 1970 and 86.5% in 1980. Most of the overall increase of black residents in Cleveland Heights occurred from 1970-76.
 
 
 3
 In 1965 and again in 1972, the homes of black residents who had recently moved into the community were bombed, and around the same time several areas of the City were the subject of heavy real estate solicitation. Among the actions of the City in response was a proclamation in 1965 declaring Cleveland Heights to be a racially open community, a 1967 ordinance forbidding "for sale" signs on private residences, a 1972 anti-telephone solicitation ordinance, and adoption in 1976 of a comprehensive real estate program, including an ordinance forbidding discrimination in housing, blockbusting, steering, and solicitation of homeowners who have filed no solicitation notices.
 
 
 4
 HCC was founded in 1972. It is a not-for-profit corporation under Ohio law, which has as its primary objective the promotion and maintenance of Cleveland Heights as an open and integrated community. Its membership includes governmental representatives; school board, library, religious and other community-wide groupings; businesses and merchants; and neighborhood organizations. Two of its major programs have been periodic new homebuyer questionnaire surveys and audits of realty companies and agents, including a 1978 audit contracted for by the City. Auditing was carried out through the use of "checkers"--paired black and white volunteers who represented to real estate agents that they were seeking housing and presented the agents with similar needs and circumstances. The results of that audit led to filing of the instant lawsuit.
 
 II.
 
 5
 Preliminarily, defendants argue that the City and HCC lacked standing to sue since they failed to prove injury.
 
 
 6
 [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," Glandstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).
 
 
 7
 Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote omitted).
 
 
 8
 In Gladstone, the Court held that a municipality had standing to sue for violations of the Fair Housing Act. It reasoned that the municipality itself suffered an injury traceable directly to such violations:
 
 
 9
 The adverse consequences attendant upon a "changing" neighborhood can be profound. If petitioners' steering practices significantly reduce the total number of buyers in the Bellwood housing market, prices may be deflected downward. This phenomenon would be exacerbated if perceptible increases in the minority population directly attributable to racial steering precipitate an exodus of white residents.... A significant reduction in property values directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services. Other harms flowing from the realities of a racially segregated community are not unlikely.... If, as alleged, petitioners' sales practices actually have begun to rob Bellwood of its racial balance and stability, the village has standing to challenge the legality of that conduct.
 
 
 10
 441 U.S. at 110-11, 99 S.Ct. at 1613 (citations & footnotes omitted).
 
 
 11
 Similarly, in Havens Realty Corp. v. Coleman, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982), the Court held, with respect to the standing of an organization similar to HCC:
 
 
 12
 If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income home-seekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities--with the consequent drain on the organization's resources--constitutes far more than simply a setback to the organization's abstract social interests....
 
 
 13
 Prior to trial, the District Court ruled that the City and HCC alleged facts sufficient to establish standing. Defendants' argument is that these facts may be contested at trial, quoting language to that effect in Bellwood, 441 U.S. at 115 & n. 31, 99 S.Ct. at 1616 & n. 31, and that since plaintiffs failed to substantiate that they had suffered actual injury of the kind postulated by the Court in Bellwood and Havens, the complaint should have been dismissed for lack of standing. Specifically, defendants argue that the City was relatively stable racially when the alleged violations occurred, and that the City failed to prove "any connection between any of the alleged violations and any threatened resegregation." Hilltop's Brief at 17. As to HCC, defendants rely on the District Court's finding in awarding only nominal damages that HCC failed to produce evidence of a causal connection between its expenditures and the alleged violations.[2]
 
 
 14
 The District Court acknowledged defendants' argument that the facts underlying standing remain to be proven at trial, concluding that "it is clear that the record provides facts which are sufficient to support plaintiffs' pretrial allegations of actual and threatened injury." Regardless of the merits of defendants' contention that its alleged violations caused plaintiffs no actual injury,[3] we believe that defendants misconstrue the language from Bellwood on which they rely. Defendants concede that the first requirement for standing is actual or threatened injury. Their argument collapses standing to litigate allegedly wrongful conduct into adjudication of the merits of the controversy. The "facts" which remain open to challenge at trial are those asserted by plaintiffs alleging that they are in the position to be caused injury as the result of the defendants' conduct. Cf. United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (plaintiff environmental groups' theory that ICC regulation would cause their members economic, recreational and aesthetic harm by discouraging recycling and thus adversely affecting the environment, was sufficient to withstand dismissal on standing grounds, subject to proof that its theory is "something more than an ingenious academic exercise in the conceivable," id. at 688, 93 S.Ct. at 2416). Here, there is no doubt that plaintiffs were in a position to be injured by defendants' alleged Fair Housing violations, and thus they have alleged and proven facts sufficient to establish actual or threatened injury.
 
 III.
 
 15
 The District Court found that five Hilltop agents violated Sec. 3604(a) on eight occasions between 1976 and 1978 by engaging in "racial steering," which the court determined "otherwise made unavailable" housing on account of race. These violations were imputed to Hilltop. Only one of the violations occurred within the 180-day limitations period prior to the date this suit was filed. The District Court held that the complaint was timely as to all violations alleged based upon its finding that they constituted a continuing pattern and practice of unlawful conduct.
 
 
 16
 In Havens, the Court adopted plaintiffs' definition of "racial steering" as:
 
 
 17
 a "practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups."
 
 
 18
 455 U.S. at 366 n. 1, 102 S.Ct. at 1118 n. 1.
 
 
 19
 Although in Bellwood and Havens the Court did not specifically address whether the racial steering violates Title VIII, see Bellwood, 441 U.S. at 116 n. 32, 99 S.Ct. at 1616 n. 32, Havens, 455 U.S. at 370 n. 7, 102 S.Ct. at 1120 n. 7, the District Court held that in the absence of significant discriminatory effect, which it found was not present in this case, an incident of racial steering would violate Sec. 3604(a) upon a showing of intent. Defendants do not directly dispute this interpretation of the law. Rather, they argue that truthful informational statements with racial content, failure to show homes in a particular location absent a specific request, and lack of service, do not violate the Act. The District Court was correct in holding that to violate Sec. 3604(a), one looks to whether the statement or conduct would have an untoward effect on a reasonable person under the circumstances who is seeking housing, and behind the statement or conduct to the intent of the agent. If a statement or act would have a discriminatory effect and is made with the intent to steer, it violates Sec. 3604(a). See Zuch v. Hussey, 394 F.Supp. 1028, 1045-46 (E.D.Mich.1975), aff'd and remanded, 547 F.2d 1168 (6th Cir.1977).
 
 
 20
 The District Judge painstakingly reviewed the facts of each alleged Sec. 3604(a) violation and applied the above principles of law to his findings. In several instances he found that plaintiffs had failed to establish either an act that would constitute steering, or the requisite intent. The essence of defendants' objections to the court's findings is that they were unsupported by the record. Discriminatory intent is a question of fact subject to the clearly erroneous standard of review. Anderson v. City of Bessemer City, --- U.S. ----, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 
 
 21
 Of particular importance, since it constitutes the linchpin supporting the remaining violations found by the District Court, is the violation which occurred within the limitations period. In October 26, 1978, Hortense Johnson, a black checker, began an audit of Hilltop agent Elayne Liff. After Johnson had described her needs to Liff, Liff attempted to contact the owner of one home, who was black, that met Johnson's description. After determining that the home had been taken off the market, Liff suggested no other homes to Johnson, either at that time or in the days following. Four days later, in a call in response to Johnson's follow-up call, Liff stated that she was busy preparing for a vacation trip to Hawaii and would contact Johnson upon her return. She did not offer to arrange for another agent to assist Johnson.
 
 
 22
 The District Judge carefully reviewed the testimony of Johnson and Liff. He found that Liff's normal practice would have been to suggest additional listings to Johnson during her initial visit besides the single black-owned home about which Liff inquired, and to refer Johnson to another agent if Liff was unavailable to help her. The court observed that although Liff claimed she was suspicious of Johnson, these suspicions were irrelevant to whether, in departing from her normal procedure, Liff denied Johnson the opportunity to see available homes on the basis of race, because Liff also testified that despite her suspicions, she " 'still went about [her] business in the usual manner.' " The court concluded that Liff's failure to provide service to Johnson violated Sec. 3604(a).
 
 
 23
 A finding is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. The question is not whether the finding is the best or only conclusion that can be drawn from the evidence, or whether it is the one which the reviewing court would draw. Rather, the test is whether there is evidence in the record to support the lower court's finding, and whether its construction of that evidence is a reasonable one. See Anderson, 105 S.Ct. at 1511-12. Applying this test in the instant case, we cannot say that the District Court's finding that Liff committed a violation of Sec. 3604(a) is clearly erroneous. Nor were the court's findings clearly erroneous respecting the other Sec. 3604(a) violations, or the Sec. 3604(c) violation, although we note that Hilltop states in its brief to this Court "that defendants are appealing the District Court's findings of violations in respect of the sole incident which occurred within the limitations period." Defendant Hilltop's Brief at 55.
 
 
 24
 In Havens, the Court held "that where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice." 455 U.S. at 380-81, 102 S.Ct. at 1125 (footnote omitted). Defendants' argument that the court erred in holding that the individual violations found satisfied the continuing violation requirement amounts to nothing more than a disagreement with the District Court's view of the evidence in its entirety. The court's finding on this point was not clearly erroneous.
 
 
 25
 Defendants also object that the District Court erred in finding that Hilltop had "the power to control the acts" of its agents, quoting Marr v. Rife, 503 F.2d 735, 742 (6th Cir.1974), and hence was liable for the violations committed by those agents. It argues that its agents were independent contractors, over whom under common law it has no control. This argument has consistently been rejected in Fair Housing Act cases. See, e.g., Green v. Century 21, 740 F.2d 460, 465 (6th Cir.1984) (citing Marr v. Rife, supra ); Northside Realty Associates, Inc. v. United States, 605 F.2d 1348, 1353-54 (5th Cir.1979). Nor does Hilltop dispute the District Court's findings respecting knowledge of Hilltop managerial personnel of fair housing violations by its agents and failure to take corrective action, despite its asserted policy of instructing its agents in fair housing law and urging that they act accordingly. The court did not err in holding Hilltop liable for the violations of its agents.
 
 IV.
 
 26
 The District Court also found that Hilltop and its agent Bruce Johanns had violated Sec. 3604(e), when Johanns mailed solicitation cards to 40 to 60 residents in a two block area of Census Tract 1401 in northeast Cleveland Heights. Johanns worked as a painting contractor in the area between 1974 and 1977, during which time he solicited painting jobs by mail. Upon becoming a Hilltop agent in 1977, he sent an announcement card to the residents of the area. In August 1978, he sent a card to residents announcing that a home in the neighborhood had been listed with him, which said: "If you have a friend or relative who would like to live near you, please have them give me a call, and I will be pleased to give them all the details and arrange for them to see it." The listed home, which had a black owner, was sold to a white buyer. In September 1978, he sent out another post card, which stated that the listed home had been sold, and represented: "In selling this property, we came into contact with other families who wish to buy in your neighborhood. Are you interested in selling your property? We would welcome the opportunity of consulting with you without obligation." Johanns admitted that there were no other families that had contacted him wishing to buy in the neighborhood. It is the September mailing that the District Court found violated Sec. 3604(e).
 
 In Zuch, Judge Keith held that:
 
 27
 Section 3604(e) ... is aimed at both overt "blockbusting" and other uninvited solicitations in racially transitional neighborhoods where it can be established (1) that the solicitations are made for profit, (2) that the solicitations are intended to induce the sale of a dwelling, and (3) that the solicitations would convey to a reasonable man, under the circumstances, the idea that members of a particular race are, or may be, entering the neighborhood.
 
 
 28
 394 F.Supp. at 1049.
 
 
 29
 There is no question that Johanns' September mailing was made for profit and intended to induce the sale of a dwelling. However, an inducement to sell only violates Sec. 3604(e) if, as provided in the statute, it includes "representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race." Such representations may be obvious or subtle, Zuch, 394 F.Supp. at 1049, but a representation respecting race must be made. The third part of the test stated by Judge Keith in Zuch merely restates the representation requirement in a way that encompasses both direct and subtle references to race. Thus, the critical question in the instant case is whether the post card sent by Johanns contained a representation that would convey to reasonable persons in the solicited area that blacks were seeking to move into the neighborhood.
 
 
 30
 In resolving this question in any given case, "[t]he concept of a racially transitional neighborhood is critically important to this litigation, because it is within this context that the activities of the real estate industry, in general, and the defendants, in particular, must be scrutinized." Zuch, 394 F.Supp. at 1033. The court found the solicited area to be a "racially transitional neighborhood."[4] It found that Johanns was warned by one resident, Mr. Hollis, after his first mailing that the resident had filed a no-solicitation card with the City and that Johanns had violated the City's no-solicitation ordinance by mailing the card to him, and that another resident, Mr. Ciocia, had complained to Hilltop after the August and September mailings. The court credited the testimony of Mr. Ciocia that he was fearful of the effect of the post cards, and that of another witness, Mr. Russo, a person with experience in real estate who lived near the solicited area, who testified that if he lived in the solicited area and received one of the cards, he would have been concerned. The court concluded that Johanns was aware of the racial composition of the neighborhood, and that to have continued to solicit "in a neighborhood that he knew was racially transitional and, therefore, subject to the fears of panic selling, rendered his acts of solicitation at least reckless." Thus, although the card sent by Johanns was completely neutral on its face,[5] the court found that it contained a representation respecting race because he knew that any form of solicitation would be likely to excite the fears of neighborhood residents and trigger panic selling.
 
 
 31
 The statute does not prescribe that a Sec. 3604(e) violation may only occur when a prohibited representation is made in a transitional neighborhood. Whether a neighborhood is in transition is significant only to the extent that its residents become more susceptible to the exploitative tactics of blockbusting.
 
 
 32
 It is a well known fact that racial tensions and anxieties are generated when blacks move into previously all-white neighborhoods. It is also well known that many real estate agencies attempt to exploit such a situation by making repeated, uninvited solicitations for the sale of homes. In most instances, this activity (commonly referred to as "blockbusting") has proven to be an effective means of stimulating the sale of homes in racially transitional neighborhoods. It does so by capitalizing upon the racial fears of whites, reminding them that blacks are moving into the area. The process was articulated quite clearly in United States v. Mitchell, 335 F.Supp. 1004, 1005-1006 (N.D.Ga.1971), where the United States District Court for the Northern District of Georgia stated:
 
 
 33
 "The evidence at the trial disclosed many illuminating things about what happens in a residential neighborhood when it becomes racially transitional. For example, if these cases are typical--and the court believes they are--the following consequences can be predicted as inevitable, and beyond dispute: First, a sense of panic and urgency immediately grips the neighborhood and rumors circulate and recirculate about the extent of the intrusion (real or fancied), the effect on property values and the quality of education. Second, there are sales and rumors of sales, some true, some false. Third, the frenzied listing and sale of houses attracts real estate agents like flies to a leaking jug of honey. Fourth, even those owners who do not sell are sorely tempted as their neighbors move away, and hence those who remain are particularly vulnerable. Fifth, the names of successful agents are exchanged and recommended between homeowners and frequently the agents are called by the owners themselves, if not to make a listing then at least to get an up-to-date appraisal. Constant solicitation of listings goes on by all agents either by house-to-house calls and/or by mail and/or by telephone, to the point where owners and residents are driven almost to distraction.
 
 
 34
 In this maelstrom the atmosphere is necessarily charged with Race, whether mentioned or not, and as a result there is very little cause or necessity for an agent to make direct representations as to race or as to what is going on. On the contrary both sides already know, all too well, what is going on. In short, for an agent to get a listing or make a sale because of racial tensions in such an area is relatively easy, whereas the direct mention of race in making the sale is superfluous and wholly unnecessary." (Emphasis by the Court.)
 
 
 35
 Zuch, 394 F.Supp. at 1049-50.
 
 
 36
 A racially neutral form of solicitation may very well contain an obvious representation respecting race in a highly charged atmosphere such as that described above. Such an atmosphere was not, however, present in the instant case. Although the solicited neighborhood could fairly be described as transitional, in the sense that residents perceived that blacks were moving into it or adjacent areas, its residents were not in the grip of panic. The neighborhood was not the subject of frenzied real estate activity. Johanns was a white real estate agent who sent a racially neutral card to the residents of a small area, many of whom were former painting customers and knew Johanns, following up a sale of a black-owned home to a white buyer. While we do not suggest that real estate agents are "entitled to one bite" in transitional neighborhoods before panic has set in, the essence of the District Court's reasoning is that any form of solicitation in any area into which blacks have moved or are moving is a per se violation of Sec. 3604(e). We have serious doubts that such a sweeping restriction on commercial speech would be constitutional, see Linmark Associates, Inc. v. Township of Willingboro, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), and do not believe that Congress intended the statute to be so applied. See Zuch, 394 F.Supp. at 1046 ("Fair Housing Act ... was designed to provide, within constitutional limit, for fair housing throughout the United States"). We do not agree with plaintiffs that the difference between the instant case and Zuch, Mitchell, and other cases finding Sec. 3604(e) violations is merely one of degree. In the absence of evidence of panic selling or other incidents of a racially charged atmosphere that would impute to any real estate solicitation a racial connotation, or evidence of an actual representation respecting race, whether suggestive or direct, there simply has not been a prohibited representation within the meaning of Sec. 3604(e). Since neither was proven in the instant case, we reverse the District Court's finding that the mailing violated Sec. 3604(e).
 
 V.
 
 37
 Plaintiffs appeal from the District Court's denial of injunctive relief. The Act provides that, "The court may grant relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees...." 42 U.S.C. Sec. 3612(c) (emphasis added). Hence, the District Court's decision not to enjoin defendants is subject to review under the abuse of discretion standard.
 
 
 38
 Upon plaintiffs' motion, the court carefully reconsidered its prior decision not to award injunctive relief. It concluded that plaintiffs had not proved that Hilltop was likely to continue to commit steering violations in the future.[6] Further, the court noted that, pursuant to 28 U.S.C. Sec. 2202, "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." The court stated that, "Should the defendants engage in further conduct which constitutes a violation of the Fair Housing Act and the plaintiffs file a supplemental claim to that effect, this court, pursuant to section 2202, is obliged to entertain and determine whether that has occurred. If established, there would then be a predicate for injunctive relief." Regardless of whether the court would have been warranted in issuing an injunction, or whether an injunction would have been the most appropriate form of relief, plaintiffs have not shown that the District Court abused its discretion in fashioning relief in this case.
 
 
 39
 Defendants argue that awarding of nominal damages of $1.00 by the District Court was error in light of the plain language of the statute providing for the award of "actual damages." Contrary to the assertion of defendants, the District Court did find that HCC had suffered a non-quantifiable injury at the hands of defendants, which would justify the award of nominal damages. See note 2 supra.
 
 VI.
 
 40
 We reverse the judgment of the District Court finding that Hilltop and its agent Bruce Johanns violated Sec. 3604(e). In all other respects, the judgment of the District Court is AFFIRMED.
 
 
 
 *
 Honorable Harry Phillips participated in oral argument but due to his death on August 3, 1985 took no part in the opinion
 
 
 [1]
 The pertinent subsections of Sec. 3604 provide that "it shall be unlawful--"
 (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.
 ....
 (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.
 ....
 (e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin.
 
 
 [2]
 The court did find, however, that defendants' violations "perceptively impaired" HCC's ability "to carry out its policy of maintaining Cleveland Heights as an open and integrated community; and that it has been necessary to expend funds to finance these monitoring activities." The latter remark suggests that the court's ruling on economic injury was not that HCC had suffered no such injury, but that the amount of its expenditures attributable to defendants' violations was too speculative to support a damage award
 
 
 [3]
 The District Court made meticulous findings of fact that defendants' violations caused or threatened the City and HCC with the type of injuries described by Bellwood and Havens as providing a basis for standing. We cannot say that these findings were clearly erroneous
 
 
 [4]
 The record shows that the two block area solicited by Johanns was virtually an all-white enclave in an otherwise integrated neighborhood. Census Tract 1401 had an estimated nonwhite population of 22% in 1978, 29% in 1979 and 37% in 1980, although the census statistic for 1980 was 30.7% nonwhite. Neighboring census tracts contained census blocks with black populations substantially higher than the 24.9% overall figure for Cleveland Heights. On the basis of these figures, the District Court determined that the solicited area was transitional, quoting language from Zuch to the effect that a "racially transitional neighborhood" or "changing neighborhood" "[t]o the layman ... is used and understood to mean that blacks are moving into an area." 394 F.Supp. at 1031
 
 
 [5]
 There were no subtle representations by Johanns of the sort present in Zuch --salespersons showing houses to black persons at night with lights on and windows unobstructed, flyers picturing or in-person visits by black agents, or literature containing thinly veiled references to neighborhood safety and other concerns foremost in the minds of white residents in neighborhoods undergoing change
 
 
 [6]
 The salesperson responsible for four of the violations left the employ of Hilltop before the action was filed. A salesperson responsible for another incident has also left its employ