**Alice SANDERS and James Sanders, Plaintiffs–Appellants,**

**v.**

**Nancy DORRIS; Century 21–Robertson County Real Estate; and Chandler Sales, Inc., Defendants–Appellees.**

No. 88–5006.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 14, 1988.

Decided May 1, 1989.

William L. Robinson, John P. Relman (argued), Lawyers Committee for Civ. Rights Under the Law, Washington, D.C., Carol Gish, R. Michael Collins, Memphis, Tenn., William H. Farmer, Farmer, Berry

& Purcell, Nashville, Tenn., for Alice and James Sanders.

L.H. Armistead, III, Charles W. Bone (argued), Bone, Langford & Armistead, Nashville, Tenn., for Nancy Dorris, Century 21–Robertson County Real Estate, Chandler Sales, Inc.

Before KEITH, JONES and MILBURN, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Plaintiffs-appellants, Alice and James Sanders, appeal the district court's finding that the defendants were not guilty of racial discrimination in housing in violation of 42 U.S.C. §§ 1981 and 1982 (1982), and the Fair Housing Act of 1968, 42 U.S.C. § 3604 *et seq.* (1982). For the reasons which follow, we reverse.

## I.

In the fall of 1984, Margaret Warren decided to sell her home in Greenbrier, Tennessee. Her son-in-law, Dr. Hugh Denny, conducted all negotiations concerning the sale of the house. Nancy Dorris, an agent for defendant Century 21–Robertson County Real Estate (Century 21), was the listing agent for the Warren house. Defendant Chandler Sales, Inc., (Chandler) owns Century 21. Dorris has been licensed to work as a real estate agent in the State of Tennessee since 1977 and has worked with Century 21 since 1983. When Dorris discussed which methods of financing Denny would prefer, he told her that he would accept any "ordinary" financing and that he would be willing to make repairs on the house if a particular type of financing required repairs. The house was first listed on October 4, 1984 and had an asking price of $48,750.00. The only change that was ever made to the listing was the asking price. The listing never contained any restrictions on the type of financing acceptable to the owner.

In March of 1985, Karen and Ray Hageman, a white couple from Kentucky, contacted another real estate agent, Dorothy Anglea, about purchasing a house in Tennessee. At that time, Anglea contacted Century 21 to secure keys to the Warren house. On March 25, 1985, Anglea showed the house to the Hagemans, prepared an offer to purchase the house and tendered the offer by taking it to Dorris's office. The offered price was $44,000.00, to be financed through a Veterans Administration (VA) loan, and the offer was accompanied with $100.00 earnest money. While stipulating that the sale must close on or before May 15, 1985, the offer specified that the contract was contingent upon the Hagemans selling their home in Kentucky.

After receiving the Hagemans' offer, Dorris contacted Denny to discuss the terms of the contract. Denny made a counteroffer in which financing with a VA loan was replaced with a requirement for a conventional loan. In addition, Dorris inserted a clause which stated that if Denny received another acceptable offer for the house, the Hagemans would be given 72 hours to remove any contingencies and prepare to close. The Hagemans accepted this counteroffer. Although this transaction was completed before April 4, 1985, the expiration date for the first listing, Denny nevertheless allowed Dorris to relist the house.

In February of 1985, the Sanders, who are black, were notified by the Farmers Home Administration (FmHA) that they were eligible for a home loan in the amount of $42,500.00. In the latter part of April 1985, they contacted O.L. Gilbert, a white real estate agent, and asked to see the Warren house. On or about April 29, 1985, Gilbert contacted Century 21 concerning the Warren house. He was not told at this or any other time that there was a pending contract on the property. On April 30, 1985, Gilbert took the Sanders to pick up the keys to the Warren house at Greenbrier Realty, the "showing" agent for Century 21. After picking up the keys, the Sanders viewed the Warren house and several other properties in the Greenbrier area. Later that afternoon, they returned to the Greenbrier Realty office to return the keys. Gilbert parked in front of a large glass window in front of the office. The

Sanders claim that they were sitting in the car, in clear view of the Greenbrier Realty agents, and that Mrs. Sanders was later introduced to a white real estate agent who worked at Greenbrier Realty.

Shortly after visiting the Warren house, the Sanders decided to make a purchase offer. Because they were unable to contact Gilbert, the Sanders contacted Nail Shakir, a black real estate agent affiliated with Battle Realtors, a predominately black real estate company in Nashville. Shakir checked with FmHA to confirm that the Sanders were eligible for a home loan and prepared a contract offer for the Warren house. The Sanders signed the contract on May 3, 1985.

As with the Hageman offer, the Sanders' contract contained errors. For example, it did not state the name of the seller and did not provide a specific description of the property to be purchased. In addition, the contract incorrectly stated that the Sanders were approved, rather than eligible, for an FmHA loan and incorrectly listed the loan application date. Further, the mailing envelope bore the incorrect zip code. Finally, there is some dispute concerning when the contract was actually mailed. Shakir testified that he mailed the contract on May 3, 1985. Although the mailing envelope is postmarked May 6, 1985, the earnest money check that accompanied the offer was dated May 3, 1985, was drawn on Shakir's wife's account and bore the address of 2617 Jefferson Street, Nashville, Tennessee. Jefferson Street is an exclusively black residential area.

Shakir contacted Dorris on May 5, 1985 to determine whether she had received the contract. She stated that she had not and told Shakir that the owners would not accept FmHA financing because they were unwilling to make the necessary repairs on the house. After receiving the contract, allegedly on May 10, 1985, Dorris verified that the Sanders were eligible for FmHA financing. Nevertheless, she contends that FmHA was not making any home loans during this period and that FmHA stated that it did not know when it would resume making home loans. Records submitted by the defendants, which were admitted in evidence at trial, show that an FmHA loan was made through Century 21 for another buyer on March 1, 1985.

Mrs. Sanders stated that, on Shakir's recommendation, she contacted Dorris on May 5, 1985—before Dorris received the contract. According to Mrs. Sanders, she and Dorris discussed the contract on the Warren house. Dorris contends that this conversation never occurred. Telephone records, which were admitted in evidence at the trial, indicate that a telephone call lasting 11 minutes was made from the Sanders' home to Dorris's residence on that day. The same telephone records indicate that calls were made from the Sanders' home to Dorris's home on May 6 and 8, 1985. Mrs. Sanders asserts that during one of her conversations with Dorris, the subject of her (Sanders') race was mentioned. Dorris testified to having received only one phone call, after May 13, 1985, and insists that the issue of race was never mentioned.

Dorris informed Denny about the Sanders' offer; however, he rejected the offer because of the price. Dorris then contacted Shakir and told him that the offer had been rejected because of the price *and* the type of financing. Dorris stated that she felt that FmHA financing was the main problem. Shakir claims that he told Dorris that the Sanders were prepared to make a higher offer for the house. He also claims that while Dorris failed to inform him that there was a contract *for sale* outstanding on the house, she did mention that there was a "lease-purchase" agreement for the house.

The Sanders' contract was returned to Shakir on May 13, 1985, at his request. The offer was rejected without any indication of which terms were objectionable. Shakir stated that because of the existing lease-purchase agreement and because the offer was rejected outright, he believed Dorris was not interested in negotiating further. As a result, Shakir made no further attempts to arrange for the Sanders to purchase the house. However, Mr. Sanders contacted Dorris by phone and made an oral counteroffer of $43,000.00 or $44,-

000.00 for the house. Dorris claims that she discussed the Hageman offer as well as the problems with FmHA financing with Mr. Sanders. She claims that she concluded the conversation by advising Mr. Sanders to contact his agent if he wished to modify or amend his initial offer. Although Mr. Sanders instructed Shakir to make another offer for the house, Shakir claims that he never submitted a written counteroffer because he felt that Dorris would reject and offer that involved FmHA financing and because the initial contract had been rejected across the board.

Although the defendants admitted that oral counteroffers are not unusual in the local real estate practice, Dorris did not pursue Mr. Sanders's offer nor did she advise Denny that the Sanders had offered a price which he may have found to be acceptable. In addition, since the Hagemans' offer for the house had expired, the Sanders' offer was the only outstanding offer on the property. Moreover, while Dorris did not inform Denny about the Sanders' counteroffer, she and Denny previously had discussed the *possibility* of initiating a lease-purchase contract offer with the Hagemans. Although Dorris presented this offer to the Hagemans, they rejected it.

On or before May 24, 1985, Mary O'Saile, a white woman, requested that Dorris act as her agent to purchase the Warren house. Though the Hagemans' offer had expired and they already had rejected the proposed lease-purchase offer, Dorris contacted Anglea and informed her that the O'Sailes had made an offer for the house. The O'Sailes offer was $40,000.00, to be paid in cash. Like the Sanders' offer, the residence was incorrectly listed on the contract. Denny rejected this offer because of the price. The O'Sailes then raised the offer to $41,000.00—$3,000.00 less than the oral offer made by Mr. Sanders. Denny accepted this offer and the sale closed on June 14, 1985.

On or about May 20, 1985, Mrs. Sanders saw a "sold" sign on the Warren house. On May 21, 1985, she filed a housing discrimination complaint with the Tennessee Human Rights Commission (Commission). Betty Wallace, the Commission's Fair Housing Coordinator, testified that she talked with Mrs. O'Saile and that O'Saile related a conversation in which Dorris allegedly told her (O'Saile) that "minorities had looked at the house." J.App. at 360–61. At trial, both Dorris and O'Saile denied that such a conversation took place. Further, Wallace testified that Dorris told O'Saile that a black family had been interested in buying the house and that she (Dorris)

> didn't want to be seen in Greenbrier showing a black man the house because the house had been vacant, and you know how black men are with white women [and that] she didn't want to be seen in Greenbrier with a black man in her car.

*Id.* at 362. Again, both Dorris and O'Saile deny that Dorris made this statement, and O'Saile signed no affidavit confirming that she made those statements to Wallace. Although defense counsel objected to Wallace's testimony on hearsay grounds, the district court never determined whether her statements were admissible as an exception to the hearsay rule.

During closing argument at the trial, the court engaged in an extended colloquy with counsel for both parties. During the course of the conversation, the trial judge made the following comments:

> Mr. Wood's [defendants' counsel] defense started out being that the homeowner wanted cash, wanted a conventional loan, and that would have been a good defense, I think ... except that now his rug has been cut out from under him by his own witness.
>
> Dr. Denny said that wasn't the case. He didn't tell Ms. Dorris what kind of loan she had to have. He would have taken anything that provided cash. He would have even paid points on [a] VA or FmHA loan.
>
> ....
>
> I think the Court could take judicial notice that Farmers Home Administration has been very, very slow in processing rural loans. And yet, a homeowner who

puts the house on the market might not want to go that route, go through the government hassle and red tape, fixing it up to their specifications and requirements. Might not want to pay the points of discount on [a] FmHA or VA loan. All those things would be a good defense.

Mr. Wood, you had that defense as of yesterday afternoon, and today, you haven't got it. You won your lawsuit yesterday and you lost it today.

J.App. at 558–59. Notwithstanding these comments, the trial court entered judgment for all of the defendants and specifically found that Chandler Sales—Century 21's owner—was not liable for failing to adequately supervise its agents.

## II.

The district court ruled that the Sanders presented no evidence of racial identification. In several of the district court's findings of fact, the court notes that no one ever directly stated to Dorris or to Dr. Denny that the Sanders were black. The Sanders claim that although Dorris never met them, she knew, or at least suspected, that they were black. We review a district court's findings of fact pursuant to the clearly erroneous rule. Fed.R. Civ.P. 52(a). This "standard is met 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Loudermill v. Cleveland Bd. of Educ.*, 844 F.2d 304, 308 (6th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)). Although most of the evidence concerning racial identification is disputed, based on the record as a whole, we conclude that Dorris knew, or at least strongly suspected, that the Sanders were black.

The record contains the following evidence which supports the Sanders' contention that Dorris knew that they were black: first Mrs. Sanders claims that she had at least one conversation with Dorris in which

the issue of her [Sanders'] race was mentioned; the address on the earnest money check was from an exclusively black residential area in Nashville; the Sanders were represented by a real estate company which is predominately black; and, the Sanders met at least one agent at the Greenbrier Realty Agency after they viewed the Warren house.

We recognize that this evidence does not positively prove that Dorris knew the Sanders were black. However, viewing the record as a whole, we conclude that Dorris must at least have *suspected* that they were black. While we do not decide whether Dorris treated the Sanders differently because of race, we note that if Dorris treated the Sanders' efforts to purchase the Warren house differently because of her knowledge *or* suspicion that the Sanders were black, such discriminatory treatment would violate the Fair Housing Act's prohibition against refusing to negotiate or sell a dwelling "because of race." Since we are left with the firm conviction that the district court erred in finding no racial identification, we reverse the district court's findings on this issue. Further, because the district court never considered whether Dorris's disparate treatment of the Sanders was because of their race, we remand this issue and instruct the court to make this determination.

## III.

The Sanders' second claim concerns evidence presented at trial which was *not* discussed in the district court's findings of fact. The specific evidence which the Sanders claim supports their case includes statistical evidence which purportedly demonstrates a pattern and practice by Century 21 of refusing to sell homes to blacks in Greenbrier and the above-discussed testimony given by Betty Wallace, the Commission's investigator. Under a clearly erroneous standard of review, we do not make credibility determinations or reweigh evidence. However, a district court's findings "should be comprehensive and relevant to the issues so as to provide a rational basis for the trial court's decision." *Grover Hill*

*Grain Co. v. Baughman–Oster, Inc.,* 728 F.2d 784, 792 (6th Cir.1984). In addition, the "findings should be explicit so as to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the grounds on which the trial court reached its decision." *Id.* at 792–93 (citations omitted).

The statistical evidence compiled by the Sanders indicates that, in her ten years as a real estate agent in the Nashville area, Dorris never sold a house in Greenbrier to a black person and had only once shown a house in Greenbrier to a potential black purchaser. In addition, although Century 21 has sold homes to blacks in Springfield—a racially mixed community—none of the agents could recall ever showing or selling a house in Greenbrier to blacks. According to the Sanders' statistical evidence, which was not challenged by the defendants at trial, housing prices in Greenbrier are indistinguishable from housing prices in Springfield. Finally, evidence presented at trial indicated that during the period that the Sanders were attempting to purchase the Warren house, there were more houses for sale in Greenbrier than in Springfield.

Although Wallace testified at length during the trial, the district court never made a final ruling concerning the admissibility of her testimony. Because the trial court made a *preliminary* ruling that her testimony was admissible to impeach Mrs. O'Saile's testimony, we will not determine whether her testimony is admissible. Rather, we remand this issue and instruct the trial court to make a final evidentiary ruling concerning the admissibility of Wallace's testimony. In addition, we instruct the court to provide more explicit factual findings explaining which evidence it accepts and which evidence it specifically rejects.

## IV.

■ In their third argument, the Sanders challenge the district court's finding that the defendants are not guilty of racial steering. We review a district court's legal conclusions *de novo.* *Loudermill,* 844 F.2d at 308. In determining whether the defendants have been guilty of racial steering, the district court found that while "the Greenbrier area of Robertson County is predominantly white ... the defendants have represented both black and white clients in the purchase and sale of real estate." J.App. at 238. In the face of allegations that the defendants made discouraging remarks about Greenbrier "in an effort to induce or direct minorities away from that area," the court nevertheless concluded that there was "no evidence of any pattern of conduct on the part of the defendants which would show any systematic effort to direct black prospective purchasers or sellers away from the Greenbrier area." *Id.*

In *Heights Community Congress v. Hilltop Realty Inc.,* 774 F.2d 135 (6th Cir. 1985), *cert. denied,* 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 318 (1986), the Sixth Circuit approved of the following definition of racial steering:

> a "practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups."

*Id.* at 139–40 (quoting *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 366 n. 1, 102 S.Ct. 1114, 1118 n. 1, 71 L.Ed.2d 214 (1981)). (We also held that if any act "would have a discriminatory effect and is made with the intent to steer, it violates § 3604(a)" of the Fair Housing Act. *Id.* at 140.

In the instant case, the Sanders provided undisputed statistical evidence that neither Dorris nor any other Century 21 agent had ever sold a house in Greenbrier to a black person. Thus, we hold that the district court erred in finding that there was no evidence that the defendants engaged in a pattern of steering black prospective home buyers away from Greenbrier. We note that it is irrelevant whether Century 21

agents had represented black clients, since the statistical evidence indicates that they steered black clients away from the predominately white community of Greenbrier and steered them to the racially mixed community of Springfield. While we do not decide whether the statistical evidence proves that the defendants are guilty of racial steering, the district court in this case failed to apply the Sixth Circuit's definition of racial steering. Therefore, we reverse the district court's conclusion that the defendants are not guilty of racial steering, and remand for reconsideration of this issue in light of *Hilltop Realty.*

## V.

■ Finally, the Sanders argue that the district court erred as a matter of law in concluding that Chandler Sales could not be held liable for Dorris's conduct. The court found that agents of Chandler Sales received regular instructions to abide by the fair housing laws and that Dorris was instructed to proceed in a "usual and appropriate manner" pursuant to her Tennessee real estate broker's license. J.App. at 239.

The defendants in *Hilltop Realty, supra,* argued that they were not liable for violations committed by their agents who were independent contractors. In addition, the defendants claimed that they had an "asserted policy of instructing [their] agents in fair housing law and urging that they act accordingly." 774 F.2d at 141. This court noted that those arguments have "consistently been rejected in Fair Housing Act cases" and we upheld the district court's finding that the defendants were liable for the discriminatory acts of their agents. *Id.*

Turning to the instant action, Chandler cannot escape liability by merely asserting that it instructed its agents not to discriminate against blacks. *See Green v. Century 21,* 740 F.2d 460, 465 (6th Cir.1984) ("Under federal housing law a principal cannot free himself of liability by delegating a duty not to discriminate to an agent"). Because this court has held that real estate agencies have the power to control the acts of their agents, *see, e.g., Marr v. Rife,* 503 F.2d 735, 742 (6th Cir.1974), we

hold that the district court applied an erroneous legal standard to determine whether Chandler was liable for the conduct of its agents. Accordingly, we reverse as to this issue and remand for reconsideration of the evidence concerning Chandler's participation in, or knowledge of, racial steering practices at Century 21.

## VI.

For the reasons stated above, we REVERSE the district court's judgment and REMAND for further proceedings consistent with this opinion.